IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BAKER'S EXPRESS, LLC,

    *Plaintiff*,

    v.

ARROWPOINT CAPITAL CORP., *et al.*,

    *Defendants*.

Civil Action No. ELH-10-2508

## MEMORANDUM OPINION

Baker's Express, LLC ("Baker's Express"), plaintiff, sued its insurer, American & Foreign Insurance Company ("A&F"), and three other companies that are successors-in-interest to A&F: Arrowpoint Capital Corp. (f/k/a Royal and Sun Alliance USA, Inc.) ("Arrowpoint Capital"); Arrowood Indemnity Company ("Arrowood Indemnity"); and Arrowood Surplus Lines Insurance Company ("Arrowood Surplus") (collectively with A&F, "Arrowpoint" or the "Insurers").[1]  Baker's Express contends that the Insurers breached their contractual obligations under the insurance policy that A&F issued to Baker's Express (the "A&F Policy") by refusing to reimburse Baker's Express for legal expenses incurred in defending a lawsuit that was filed in New Jersey by Ronnie Barnes, a former employee of Baker's Express (the "Barnes Suit").  It seeks damages in the amount of $200,000, the sum of its unpaid legal expenses in the Barnes Suit, as well as its attorneys' fees incurred in prosecuting this action.

---

[1]  Baker's Express filed suit in the Circuit Court for Baltimore City, Maryland.  *See* Complaint (ECF 1-1).  The Insurers removed the case to federal court on the basis of diversity of citizenship.  *See* 28 U.S.C. §§ 1332(a), 1441; *see also* Notice of Removal (ECF 1).

A&F merged with Arrowood Indemnity in 2004 (at that time, Arrowood Indemnity was known as Royal Indemnity Company; it changed its name in 2007).  *See* ECF 31 at 5 n.1.  Arrowood Surplus is a subsidiary of Arrowood Indemnity, and Arrowood Indemnity and Arrowpoint Capital are subsidiaries of a shared corporate parent, Arrowpoint Group, Inc., which is not a party to this case.  *See id.*

The parties have filed cross-motions for summary judgment.  *See* Defendant's Motion for Summary Judgment ("Insurers' Motion") (ECF 31); Plaintiff's Motion for Summary Judgment (ECF 33) (collectively with its supporting memorandum, ECF 33-2, "Baker's Motion").  The motions have been fully briefed,[2] and no hearing is necessary to resolve them.  *See* Local Rule 105.6.  For the reasons that follow, I will grant in part and deny in part both motions.

## Background[3]

### A.  Baker's Express and its Affiliates

Baker's Express is a distributor of baked goods to "450 grocery stores located in Delaware, Pennsylvania, New York, New Jersey, Connecticut, Rhode Island, Massachusetts, New Jersey, and metropolitan New York City."  Baker's Motion at 3-4.  It operates out of offices and a warehouse and terminal located in South Plainfield, New Jersey.  *Id.* at 4; *see also* Deposition of Greg Parker at 13-16, 44-45 ("Parker Dep.");[4] Deposition of Allan Sten, General Manager of Baker's Express, at 7, 20-21, 32 ("Sten Dep."), Ex.C to Baker's Motion (ECF 33-5).  Baker's Express is organized as a limited liability company under the laws of Maryland and, in its organizational filings with Maryland's Department of Assessments and Taxation, it listed an address in Baltimore, Maryland as its principal office.  *See* Ex.B to Baker's Motion (ECF 33-4).

---

[2] In addition to the cross-motions, I have considered the Insurers' reply and cross-opposition (ECF 36) (collectively with its supporting memorandum, ECF 36-2, "Insurers' Reply"); a reply filed by Baker's Express ("Baker's Reply") (ECF 38); surreplies filed by both sides with leave of court, *see* Insurers' Surreply (ECF 40); Baker's Surreply (ECF 43); *see also* Local Rule 105.2; and numerous exhibits submitted by both sides.

[3] The facts presented in the Background section are undisputed for the purpose of the motions.

[4] Mr. Parker testified as Baker's Express's corporate designee pursuant to Fed. R. Civ. P. 30(b)(6).  Both sides have submitted excerpts of his deposition as exhibits.  *See* Ex.H to Insurers' Motion (ECF 31-8); Ex.F to Baker's Motion (ECF 33-8).  Rather than refer to the pagination of particular exhibits, I cite to the pagination of the transcript.

Notably, at the times relevant to this suit, Baker's Express was affiliated with several other business entities through common ownership. One of those business entities was H&S Holdings Corporation ("H&S"), whose offices are located at the same Baltimore address that Baker's Express listed as its principal office. *See* Parker Dep. at 93-94, 100-01; *see also* Ex.D to Baker's Motion at 3 (ECF 33-6).

Another business entity affiliated with Baker's Express through common ownership was Metroplex Harriman, a distributor of foodstuffs and supplies to McDonald's restaurants.[5] *See* Parker Dep. at 9; Sten Dep. at 32. Metroplex Harriman's offices were located in Harriman, New York. Parker Dep. at 11. Greg Parker, Baker's Express's corporate designee, testified at his deposition that, because Baker's Express and Metroplex Harriman shared common ownership, certain administrative functions for the two companies were "centralized" with Metroplex Harriman. Parker Dep. at 10; *see also id.* at 10-12, 28-29. Payroll, internal accounting, some banking, and some aspects of management of insurance coverage for Baker's Express (including receipt of policies and maintenance of records regarding coverage) were handled by Metroplex Harriman out of its New York office. *See id.* at 10-12, 20-29, 42. Moreover, Mr. Parker, who was responsible for handling these centralized functions, was an employee of Metroplex Harriman, not Baker's Express. *See id.* at 8.

## B. The A&F Policy

At all times relevant, Baker's Express was insured under a Worker's Compensation and Employer's Liability Insurance Policy issued by A&F (the "A&F Policy"). *See* Policy, Ex.12 to Parker Dep. (ECF 33-8 at 58-87). Baker's Express procured the A&F Policy through a broker,

---

[5] Although Metroplex Harriman was affiliated with Baker's Express at the times relevant to this suit, it was subsequently sold to another entity, severing the affiliation with Baker's Express. *See* Parker Dep. at 7-13.

Insurance Services Group, Inc. ("ISG").  ISG's offices are located in Towson, Maryland.  *See* Insurers' Motion at 2; Baker's Motion at 5.

Among other things, the A&F Policy insured Baker's Express against liability for "bodily injury by accident" suffered by its employees, up to a $500,000 limit of liability per accident. A&F Policy at 60, 68.[6]  The A&F Policy contained an exclusion, denominated as "Exclusion C7," which stated that the insurance did not cover "damages arising out of coercion, criticism, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination against or termination of any employee, or any personnel practices, policies, acts or omissions."  *Id.* at 70.  The A&F Policy also contained a "New Jersey Part Two Employers Liability Endorsement," which provided, *inter alia*:  "With respect to Exclusion C7 we will defend any claim, proceeding or suit for damages where bodily injury is alleged."  *Id.* at 84.

The A&F Policy contained several interrelated provisions concerning the locations where the policy provided coverage.  Only one state, New Jersey, was listed in "Item 3.A" of the Information Page, which was a listing of "Covered States."  *Id.* at 76.  In the "General Section" of the A&F policy, under the heading  "Locations," the Policy provided: "This policy covers all of your workplaces listed in Items 1 or 4 of the Information Page; and it covers all other workplaces in Item 3.A. states unless you have other insurance or are self-insured for such workplaces."  A&F Policy at 67.  "Item 1" of the policy's "Information Page" listed the "Named Insured & Address" as Baker's Express, at the address of Metroplex Harriman's office in Harriman, New York.  *Id.* at 60.  "Item 4," which was contained on an "Extension of Information

---

[6] The A&F Policy is composed of a policy "jacket," which contains an "Information Page," several "Extensions of [the] Information Page," a core "Policy" form, and a number of other forms, endorsements, and schedules, the pages of which are not consecutively numbered. In citing to the A&F Policy, I have used the consecutive pagination created by the Court's electronic filing system in the copy of the policy submitted as Exhibit 12 to Mr. Parker's Deposition (Ex.F to Baker's Motion).

Page," listed one "Entity" (Baker's Express, with Metroplex Harriman's address) and one "Location" (the address of Baker's Express's office and warehouse in South Plainfield, New Jersey). *Id.* at 77.

In addition, the A&F Policy contained provisions for "Other States Insurance," which applied to states "shown in Item 3.C. of the Information Page." *Id.* at 71. "Item 3.C" of the Information Page, which was also captioned "Other States Insurance," listed "All States *Except*" North Dakota, Ohio, Washington, West Virginia, Wyoming, and "states listed under item 3.A" (*i.e.*, New Jersey). *Id.* at 76 (emphasis added). As to "Other States Insurance," the A&F Policy provided: "If you begin work in any one of those states after the effective date of this policy and are not insured or are not self-insured for such work, all provisions of the policy will apply as though that state were listed in Item 3.A. of the Information Page," (*i.e.*, as if it were listed as one of the "Covered States"). *Id.* at 71. Moreover, the A&F Policy stated: "If you have work on the effective date of this policy in any state not listed in Item 3.A. of the Information Page, coverage will not be afforded for that state unless we are notified within thirty days." *Id.*

The A&F Policy also contained numerous endorsements that, by their terms, were applicable to New Jersey-based insureds and made reference to New Jersey law. *See, e.g.*, A&F Policy at 79 ("Pending Rate Change Endorsement" referring to a pending rate change in New Jersey); *id.* at 81 ("New Jersey Approved Managed Care Program Endorsement"); *id.* at 82 ("New Jersey Premium Discount Endorsement Schedule Y"); *id.* at 84 ("New Jersey Part Two Employers Liability Endorsement," containing, *inter alia*, the amendment "[w]ith respect to Exclusion C7" quoted, *supra*); *id.* at 85 ("New Jersey Participating Provision Endorsement"). However, the A&F Policy did not contain a choice of law or forum selection provision.

The jacket for the A&F Policy contained the following statement, above the signatures of three A&F officers: "IN WITNESS WHEREOF, company has caused this policy to be signed officially below, *but this policy shall not be valid unless countersigned on the information page by a duly authorized representative of the company*." A&F Policy at 59 (emphasis added).[7] The Information Page contained a line for a "countersignature," which was signed (using a "rubberstamp signature") by David Dixon, an insurance producer with the insurance broker ISG. *See* Affidavit of David Dixon ¶¶ 6-8 ("Dixon Aff."), Ex.G to Baker's Motion (ECF 33-9). Next to the countersignature on the A&F Policy's Information Page was a listing of the "Issuing Office," an address in Baltimore that was A&F's Baltimore underwriting office. *See* Mooney Dep. at 50-51; Baker's Motion at 11. The A&F Policy was assembled into the jacket at A&F's Baltimore office and then transmitted to ISG. *Id.*

According to Mr. Dixon, ISG acted as an "agent" and "authorized representative" of A&F in establishing the policy, and Baker's Express's copy of the A&F Policy was mailed to ISG for ISG to "ensure that it contained the coverages we asked for" before countersigning it on A&F's behalf and transmitting it to Baker's Express. *Id.* ¶¶ 3-6.[8] Mr. Dixon also averred that the A&F Policy was "'agency-billed' which means that Bakers [sic] Express paid the premium by mailing checks, in installments, to ISG's office in Towson, Maryland," and "ISG would then forward the premium payments to American & Foreign." *Id.* ¶¶ 9-10. Mr. Parker of Metroplex Harriman testified that Baker's Express issued the premium payment checks for the A&F Policy from Baker's Express's South Plainfield, New Jersey office to ISG in Towson, Maryland.

---

[7] Robert D. Mooney, a Claim Executive with Arrowood Indemnity, was deposed as the Insurers' corporate designee, under Fed. R. Civ. P. 30(b)(6). He testified that the policy jacket formed a part of the A&F Policy. Deposition of Robert D. Mooney at 48 ("Mooney Dep."), Ex.H to Baker's Motion (ECF 33-10).

[8] Mr. Mooney testified that Mr. Dixon, as an employee of ISG, would have been authorized to countersign the A&F Policy on behalf of A&F. Mooney Dep. at 49.

Parker Dep. at 60; *see also* Ex.8 to Parker Dep. (ECF 33-8 at 54-57) (premium checks from Baker's Express payable to ISG).

### C.  The Zurich Policy

Baker's Express was also insured under a "Private Company Directors, Officers and Employees Liability Policy" (the "Zurich Policy"), issued by Zurich American Insurance Company ("Zurich").  *See* Zurich Policy, Ex.L to Insurers' Motion (ECF 31-12).  Although H&S was the named insured under the Zurich Policy, *id.* at 2, the Zurich Policy also covered "subsidiaries" of the named insured.  *Id.* at 5-6.  Baker's Express was one of several business entities defined as "subsidiaries" of H&S under an endorsement to the policy.  *Id.* at 32-3.

Subject to certain exclusions, the Zurich Policy insured, *inter alia*, against liability for "Employment Practices Claims," defined as claims brought by past, present, or prospective employees for

> wrongful dismissal, discharge or termination of employment, breach of any oral or written employment contract or quasi-employment contract, employment-related misrepresentation, violation of employment discrimination laws (including workplace or sexual harassment), wrongful failure to employ or promote, wrongful discipline, wrongful deprivation of a career opportunity, negligent evaluation, invasion of privacy, employment-related defamation, or employment-related wrongful infliction of emotional distress.

*Id.* at 2-6.  However, the Zurich Policy's coverage for Employment Practices Claims excluded coverage for "bodily injury, . . . sickness, disease, or death of any person."  *Id.* at 7.

The Zurich Policy provided coverage up to a limit of $3.5 million per claim or policy period.  *Id.* at 2, 37.  But, pursuant to a "Split Deductible Endorsement," insurance coverage for Employment Practices Claims under the Zurich Policy was subject to a $200,000 deductible per claim.  *See id.* at 25; *see also id.* at 9.

### D.  The Barnes Suit

In August 2006, Ronnie Barnes, who was formerly employed as a delivery route driver by Baker's Express, filed suit in a New Jersey state court against Baker's Express and three of its supervisory employees.  *See* Baker's Motion at 3.  Mr. Barnes alleged that Baker's Express and its supervisors had discriminated against him on the basis of race in the assignment of vehicles and other equipment.  He also claimed that he suffered an on-the-job bodily injury arising out of the alleged racial discrimination, because the equipment that was assigned to him had malfunctioned.  *See generally* Ex.J to Insurers' Motion (ECF 31-10) (copy of complaint in the Barnes Lawsuit).  The Barnes Suit was subsequently removed to the United States District Court for the District of New Jersey.  *See* Insurers' Motion at 3.

Baker's Express notified Zurich of the Barnes Suit in September 2006.  *See* Baker's Motion at 4.  In October 2006, Baker's Express engaged the Maryland law firm of Miles & Stockbridge, P.C. to represent it in the Barnes Suit.  In turn, Miles & Stockbridge retained the New Jersey law firm of McCarter & English, L.L.P. to serve as local counsel in New Jersey, because Anthony W. Kraus, Esquire, of Miles & Stockbridge, who served as lead counsel for Baker's Express in the Barnes Suit, was not admitted to practice in New Jersey.  *See* Ex. Z to Insurers' Motion (ECF 31-26) (letter of Anthony Kraus to Zurich).  In January 2007, Zurich informed Baker's Express (via a letter to John Cirillo of H&S) that it would provide coverage for the defense and indemnification of Baker's Express in the Barnes Suit, subject to a reservation of rights, as an Employment Practices Claim, due to the employment discrimination allegations in the lawsuit.  *See* Ex.K to Insurers' Motion (ECF 31-11) (letter to Cirillo).  However, Zurich advised that it would reserve its right to deny coverage as to claims that came within exclusions

in the Zurich Policy, including Mr. Barnes's allegations of bodily injury. *See id.* at 5. Moreover, coverage was subject to the $200,000 deductible. *See id.* at 3.

Baker's Express notified Arrowpoint of the Barnes Suit on April 30, 2007. *See* Insurers' Motion at 4; *see also* Ex.N to Insurers' Motion (ECF 31-14) (notice of claim). By that time, Baker's Express had incurred more than $200,000 in legal fees and costs charged by Miles & Stockbridge, thereby satisfying the deductible of the Zurich Policy. *See* Insurers' Motion at 4.

In September 2007, Arrowpoint advised Baker's Express (via a letter to Mr. Kraus of Miles & Stockbridge) that it would participate in the defense of Baker's Express in the Barnes Suit, subject to a reservation of rights. *See* Ex.O to Insurers' Motion (ECF 31-5) (letter to Kraus). In particular, Arrowpoint asserted that it would "not reimburse Baker's [Express] for any defense costs that it incurred prior" to April 30, 2007, the date on which Baker's Express had tendered the claim to Arrowpoint for coverage. *Id.* at 1. Moreover, Arrowpoint asserted that its "obligation to indemnify Baker's [Express] is . . . only for 'bodily injury' . . . . If it is ultimately determined in the course of defending this action that [Mr. Barnes] is not entitled to recover damages for 'bodily injury' within the meaning of that term . . . [Arrowpoint's] participation in Baker's [Express's] defense will cease." *Id.* at 5.

The Barnes Suit was ultimately settled in January 2008 for the sum of $250,000, of which Zurich paid $175,000 and Arrowpoint paid $75,000. Insurers' Motion at 5. In addition, Arrowpoint agreed to waive any lien on Mr. Barnes's recovery of worker's compensation benefits. *Id.*

Arrowpoint declined to reimburse Baker's Express for any of the attorneys' fees and other litigation expenses it had incurred before the tender of the claim to Arrowpoint on April 30, 2007. However, in a letter from Arrowpoint's coverage counsel, Kevin E. Wolff, Esq., of the

law firm Coughlin Duffy LLP, to a representative of Zurich, dated February 26, 2008, Arrowpoint agreed that it would pay 50% of what it considered to be the reasonable post-tender litigation expenses that Baker's Express had incurred.  *See* Letter from Wolff of Feb. 26, 2008, Ex.J to Insurers' Reply (ECF 36-12).   According to Mr. Wolff, Arrowpoint concluded that $207,696.09 in reasonable and necessary litigation expenses had been incurred post-tender,[9] and so Arrowpoint remitted payment to Miles & Stockbridge for half of that amount, totaling $103,848.04.  *See id.* at 2; *see also* Ex.V to Insurers' Motion (ECF 31-22) (letter from Wolff to Kraus of April 21, 2008, enclosing check in the amount of $103,848.04).

Subsequently, Zurich's coverage counsel, Angela Probasco, Esq., of the law firm of Kutak Rock LLP, performed an analysis of the total litigation expenses for the Barnes Suit, both before and after tender to Arrowpoint.   Kutak Rock concluded that, although Miles & Stockbridge had invoiced a total of $519,223.71 in attorneys' fees and expenses, only $409,896.12 of that amount was reasonable and necessary.  *See* Email of March 5, 2008, from Probasco to Kraus *et al.*, Ex.R to Insurers' Reply (ECF 36-20); *see also* Ex.J to Baker's Motion (ECF 33-12).   On that basis, Zurich remitted to Baker's Express the amount of $106,048, representing the $409,896.12 in reasonable and necessary litigation expenses, less the $103,848.04 paid by Arrowpoint and the $200,000 deductible under its policy.  *See* ECF 36-20.

Baker's Express subsequently filed this suit.   In Count One of its complaint, Baker's Express seeks to recover from Arrowpoint the $200,000 in attorneys' fees and costs it incurred in satisfaction of the Zurich Policy's $200,000 deductible, and before providing notice of the

---

[9] Of a total of $252,312.66 in post-tender litigation expenses, Arrowpoint's coverage counsel deducted $44,616.09.  *See* ECF 36-12 at 2.  Of the $44,616.09 deducted, $38,340.91 represented fees and expenses of Baker's Express's New Jersey local counsel, McCarter & English.  *Id.*  The remainder represented "such things as coverage-related entries and billing at an incorrect paralegal hourly rate."  *Id.*

Barnes Suit to Arrowpoint.  *See* Complaint ¶¶ 45-47.[10]  In Count Two of its Complaint, Baker's

Express seeks its attorneys' fees incurred in this litigation.  *See id.* ¶¶ 48-51.

Additional facts are included in the Discussion.

**Discussion**

A.  Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is

appropriate only "if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law."  A fact is "material" if it "might affect the

outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986).

In resolving a summary judgment motion, the court must view all of the facts, including

reasonable inferences to be drawn from them, in the light most favorable to the non-moving

party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *News

and Observer Publishing Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir.

2010); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).  "A party

opposing a properly supported motion for summary judgment 'may not rest upon the mere

allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'" showing that

there is a triable issue.  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th

Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004).  *See*

---

[10]  As noted, Zurich reimbursed Baker's Express for all of what it considered the
reasonable attorneys' fees and other litigation expenses in excess of the $200,000 deductible and
for which Arrowpoint did not pay, including fees that were incurred before the tender of the
claim to Arrowpoint.  *See* Insurers' Motion at 16 n.5; *see also* Ex.Y to Insurers' Motion (ECF
31-25).  Baker's Express has not challenged any of the deductions applied by Zurich on the basis
of reasonableness, nor has it challenged the deductions on the basis of reasonableness applied by
Arrowpoint to the post-tender fees and expenses.  Thus, only the $200,000 in fees and expenses
incurred before the deductible was satisfied are at issue.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Liberty Lobby*, 477 U.S. at 249.  If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," there is a dispute of material fact that precludes summary judgment.  *Id.* at 248.

When, as here, the parties have filed cross-motions for summary judgment, the court must consider "each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'"  *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted), *cert. denied*, 540 U.S. 822 (2003).  "Both motions must be denied if the court finds that there is a genuine issue of material fact.  But if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment."  10A WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 2720, at 336-37 (3d ed. 1998, 2012 Supp.).

Baker's Express has not addressed in its motion its alleged entitlement to attorneys' fees incurred in connection with this case, which is the subject of Count Two of its complaint.  Although Baker's Express has not styled its motion as one for partial summary judgment, its motion is, in effect, a motion for partial summary judgment because it seeks summary judgment only as to Count One.

## B.  Choice of Law

The parties' primary dispute is over which state's substantive law applies.  The Insurers contend that New Jersey law governs this case, while Baker's Express argues for application of Maryland law.  The resolution of this question has significant consequences because the courts

of the two states take differing positions as to an insured's entitlement to reimbursement from its insurer for attorneys' fees and costs incurred before tender of a claim to the insurer for a defense.

In New Jersey, the leading case with respect to an insurer's liability to its insured for reimbursement of pre-tender litigation expenses is *SL Industries, Inc. v. American Motorists Insurance Co.*, 607 A.2d 1266 (N.J. 1992). In that case, the New Jersey Supreme Court stated, *id.* at 1272-73 (internal citations omitted):

> [T]he insured being sued is responsible for promptly conveying to its insurance company the information that it believes will trigger coverage. If it conveys that information properly and promptly, it will be reimbursed for previously-expended defense costs. However, if the insured does not properly forward the information to the insurance company, the insured cannot demand reimbursement from the insurer for defense costs the insurer had no opportunity to control.
>
> \* \* \*
>
> Accordingly, when the insured's delay in providing relevant information prevents the insurer from assuming control of the defense, the insurance company is liable only for that portion of the defense costs arising after it was informed of the facts triggering the duty to defend.

In *SL Industries*, the insured had not provided the insurer with information relevant to the duty to defend until "a few weeks before settlement." *Id.* at 1273. In that context, the New Jersey court held, *id.*:

> To the extent that [the insurer] was under a duty to defend the suit, [the insured's] delay in providing the relevant information estops it from claiming reimbursement for its full defense costs. It may recover only those costs expended between the date it notified American of the facts necessary to determine coverage and the date of the settlement.

Courts applying New Jersey law and interpreting *SL Industries* have held that an insurer "has no obligation to reimburse [its insured] for defense costs incurred before" the insurer receives notice of a claim. *Pittson Co. v. Allianz Ins. Co.*, 905 F. Supp. 1279, 1312 (D.N.J. 1995), *rev'd on other grounds*, 124 F.3d 508 (3d Cir. 1997). *See Kitchenefsky v. Nat'l Rent-A-Fence of Am., Inc.*, 88 F. Supp. 2d 360, 370 (D.N.J. 1993) (relying on *SL Industries* to hold that

- 13 -

insurer was not liable for reimbursement of pre-tender legal expenses); *Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.*, 817 F. Supp. 1136, 1161 (D.N.J. 1993) (relying on *SL Industries* to hold that insurer was "not responsible for reimbursing [insured] for defense costs incurred" pre-tender); *see also Ohaus v. Continental Cas. Ins. Co.*, 679 A.2d 179, 184 (N.J. Super. Ct. App. Div. 1996) (stating that *SL Industries* "barred coverage for the *costs of defense* prior to the insured's disclosing the relevant information") (emphasis in original).

Maryland's courts take a different approach. In *Sherwood Brands, Inc. v. Hartford Accident & Indemnity Co.*, 347 Md. 32, 48, 698 A.2d 1078, 1085-86 (1997), the Maryland Court of Appeals explained that there are three different factual scenarios in which an "insurer's exposure for pre-notice litigation expenses are presented:"

> (1) following a delayed notice, the insurer undertakes the defense, (2) following a delayed notice, the insurer declines to undertake the defense based on the delayed notice, asserting that the delay constitutes a material breach on the part of the insured, thereby excusing performance by the insurer, or (3) following a delayed notice, the insurer declines to undertake the defense for some other reason that would likely have been asserted without regard to the delayed notice.

This case presents the first scenario identified in *Sherwood Brands*: Arrowpoint undertook the defense of Baker's Express following delayed notice of the Barnes Suit. The *Sherwood Brands* Court articulated the analysis a court must undertake when faced with the first scenario, *id.* at 48-49, 698 A.2d at 1086:

> Had the notice been given earlier, the insurer would have undertaken the defense at the earlier time and therefore would have incurred all, part, or perhaps even more of the expenses incurred by the insured. The relevant question as to pre-notice expenses . . . is whether the insurer has been prejudiced . . . : was it reasonable, under the circumstances, for the insured to have incurred the expense; was the expense reasonable; did the expense materially exceed that which the insurer would likely have incurred in any event had the notice been given earlier?[11]

---

[11] In a footnote, 347 Md. at 49 n.7, 698 A.2d at 1086 n.7, the *Sherwood Brands* Court commented further on the standard of reasonableness:

Notably, the *Sherwood Brands* Court cited the New Jersey Supreme Court's decision in *SL Industries*, but declined to follow it. *See Sherwood Brands*, 347 Md. at 47, 698 A.2d at 1085. The court reasoned that, by statute in Maryland, an insured's duty to notify the insurer is a covenant and not a condition precedent to coverage, and that the duty to defend the insured arises immediately upon the filing of a suit against the insured that comes within the policy's coverage. *See id.* at 41-42, 698 A.2d at 1082-83 (citing prior codification of Md. Code (2011 Repl. Vol.), § 19-110 of the Insurance Article ("Ins.")).   Under Maryland law, an insured's breach of the covenant to notify will absolve the insurer of its duty to defend only where the failure to provide notice results in "'actual prejudice to the insurer.'"   *Sherwood Brands*, 347 Md. at 42, 698 A.2d at 182) (quoting predecessor to Ins. § 19-110).   Rejecting the application of *SL Industries* and similar decisions in other jurisdictions, the *Sherwood Brands* Court said: "Courts that espouse the view that the duty to defend does not arise until notice is given are, of course, prone to conclude that an insurer is not liable for costs and fees incurred by an insured prior to such notice." *Id.* at 47, 698 A.2d at 1085.

In sum, under New Jersey law, an insured's failure to tender promptly a claim for coverage to its insurer excuses the insurer from liability for pre-tender litigation expenses. Under Maryland law, such a failure will only excuse the insurer from liability for those expenses if the insurer can show that it was prejudiced by the delayed tender.   Accordingly, a

---

The fact that an expense incurred by the insured was, itself, reasonable in amount does not necessarily resolve the question of prejudice.  The insurer may, for example, have an arrangement with competent defense counsel or a competent investigator or other support person to provide service at a negotiated rate.  If the insured, in derogation of its contractual duty not to do so, employs counsel or other litigation support persons at rates that, though not facially unreasonable, are nonetheless substantially in excess of those that would have otherwise been paid by the insurer had it been notified and undertaken the defense earlier, the insurer may have some basis for claiming prejudice, at least to the extent of the difference.

determination as to choice of law must be made here.  *See Cleaning Authority, Inc. v. Neubert*, 739 F. Supp. 2d 807, 820 (D. Md. 2010) ("'Choice-of-law analysis becomes necessary . . . only if the relevant laws of the different states lead to different outcomes.'") (citation omitted).

In exercising diversity jurisdiction, a federal court "must apply the substantive law of the forum state including its choice of law rules." *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97, (1941), and *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938)).  As Maryland is the forum state of this Court, I must apply Maryland's choice of law rules to determine whether it is the substantive law of New Jersey or Maryland that applies.

When an insurance policy, such as the A&F Policy, contains no choice of law provision, Maryland applies the doctrine of *lex loci contractus*, under which "the law of the jurisdiction where the contract was made controls its validity and construction." *U.S. Life Ins. Co. v. Wilson*, 198 Md. App. 452, 463, 18 A.3d 110, 116 (2011); *see also Allstate Ins. Co. v. Hart,* 327 Md. 526, 529, 611 A.2d 100, 101 (1992) ("Maryland courts ordinarily apply the law of the jurisdiction where the contract was made.").  "For choice-of-law purposes, a contract is made where the last act necessary to make the contract binding occurs." *Konover Property Trust, Inc. v. WHE Assocs., Inc.*, 142 Md. App. 476, 490, 790 A.2d 720, 728 (2002) (citing *Commercial Union Ins. Co. v. Porter Hayden Co.*, 116 Md. App. 605, 672, 698 A.2d 1167, 1200 (1997) ("*Porter Hayden II*"), *cert. denied*, 348 Md. 205, 703 A.2d 147 (1997)).

"Typically, '[t]he *locus contractus* of an insurance policy is the state in which the policy is delivered and the premiums are paid,'" *Porter Hayden II*, 116 Md. App. at 673, 698 A.2d at 1200 (citation and some internal quotation marks omitted), because delivery of the policy and payment of the premium are ordinarily the last acts necessary to make an insurance policy

binding.  *See Aetna Cas. & Sur. Co. v. Souras*, 78 Md. App. 71, 77, 552 A.2d 908, 911 (1989).

However, if the insurance policy provides that "'it *shall not be valid until it is countersigned* by

an officer or agent of the company, *the place of countersigning is* held to be *the place of the*

*making of the contract.*'"  *Ohio Cas. Ins. Co. v. Ross*, 222 F. Supp. 292, 295 (D. Md. 1963)

(emphasis added) (citation omitted); *accord Ifco Sys. N. Am., Inc. v. Am. Home Assurance Co.*,

No. WMN-09-2874, 2010 WL 1713866, at *2-3 (D. Md. April 27, 2010); *Rouse Co. v. Fed. Ins.*

*Co.*, 991 F. Supp. 460, 464-65 (D. Md. 1998); *Eastern Stainless Corp. v. American Protection*

*Insurance Co.*, 829 F. Supp. 797, 799 (D. Md. 1993); *Riviera Beach, Riviera Beach Vol. Fire*

*Co., Inc. v. Fid. & Cas. Co. of N.Y.,* 388 F. Supp. 1114, 1119-20 (D. Md. 1975); *ARTRA Grp. v.*

*Am. Motorists*, 100 Md. App. 728, 736, 642 A.2d 896, 900 (1994), *rev'd on other grounds*, 338

Md. 560, 659 A.2d 1295 (1995).

Of import here, "Maryland has not adopted the 'most significant relationship' test stated

in § 188 of the Restatement (Second) but has maintained its allegiance to the *lex loci contractus*

principle."  *Jackson v. Pasadena Receivables, Inc.*, 398 Md. 611, 619 n.3, 921 A.2d 799, 804 n.2

(2007).  Section 188 of the RESTATEMENT (SECOND) OF CONFLICT OF LAWS provides that the

"rights and duties of the parties with respect to an issue in contract are determined by the local

law of the state which, with respect to that issue, has the most significant relationship to the

transaction and the parties."  Unlike Maryland, New Jersey has adopted the "most significant

relationship" test with respect to choice of laws governing liability insurance policies.  *See, e.g.*,

*Pfizer, Inc. v. Employers Ins. of Wausau*, 712 A.2d 634, 636-38 (N.J. 1998); *Gilbert Spruance*

*Co. v. Pa. Manuf. Ass'n Ins. Co.*, 629 A.2d 885, 888-94 (N.J. 1993).

The Insurers argue that the *locus contractus* in this case is New Jersey, because the

premium payment checks were sent from Baker's Express's offices in New Jersey.  Insurers'

Motion at 10.  Moreover, the Insurers reject the notion that the countersignature of Mr. Baker of ISG was the last act necessary to effectuate the policy because, as the Insurers see it, ISG was not their "authorized representative"; rather, ISG was an agent of Baker's Express.  Insurers' Reply at 17.  In any event, the Insurers argue that "New Jersey law should apply to this case regardless of the outcome of any *lex loci contractus* analysis," Insurers' Motion at 8, because the A&F Policy was drafted to comply with New Jersey insurance regulations and provided coverage primarily to Baker's Express's office and warehouse in New Jersey.  *Id.* at 11-13.  Accordingly, the Insurers argue that New Jersey law should apply under the doctrine of *renvoi*, an exception to "traditional common law choice-of-law principles," which provides "that, when the forum court's choice-of-law rules would apply the substantive law of a foreign jurisdiction to the case before the forum court, the forum court may apply the whole body of the foreign jurisdiction's substantive law including the foreign jurisdiction's choice-of-law rules." *American Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 574, 659 A.2d 1295, 1301-02 (1995); *see* Insurers' Motion at 13-15.

In contrast, Baker's Express maintains that the *locus contractus* is Maryland, because that is where Mr. Dixon of ISG countersigned the A&F Policy, and that delivery of the policy and payment of the premium were not necessary to make it effective.  Baker's Motion at 11.  Moreover, even if delivery of the policy and payment of the premium were necessary to make it effective, the premium payments were sent to ISG in Maryland, and thus, as Baker's Express sees it, payment was made in Maryland.  *Id.*

This case illustrates the significant benefits that accrue to a plaintiff's choice of the forum in which to institute litigation.  *Cf. El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 487 (1999) (discussing "the usual policy of letting a plaintiff choose the forum").  And, this case

demonstrates the wisdom of including choice of law and forum selection clauses in contracts. Presumably, A&F could have opted to include an express choice of law or choice of forum provision in the A&F Policy, or it could have included provisions explicitly addressing the substantive legal issue in dispute, by providing that it would not be liable for pre-tender litigation expenses.  A&F did not do so, however.  In the absence of a choice of law provision, this Court is bound to apply the law of the forum state—Maryland—as to choice of law.  Despite the A&F Policy's obvious substantial connections to New Jersey, Maryland does not recognize the "most significant relationship" test for choice of law.  *See Jackson*, *supra*, 398 Md. at 619 n.3, 921 A.2d at 804 n.2.  As I shall explain, neither *lex loci contractus* principles nor the doctrine of *renvoi* as it is recognized in Maryland permit this Court to apply New Jersey law to this dispute.

As a threshold matter, the express countersignature provision of the A&F Policy delineates the place where the last act necessary to make the policy effective occurred.  A host of cases, a handful of which were cited earlier, have held that when an insurance policy contains such a provision, the place where the policy is countersigned is the *locus contractus*.  *Eastern Stainless Corp.*, *supra*, 829 F. Supp. 797, is particularly noteworthy because the insurance policy at issue there contained a provision identical to the one contained in the jacket for the A&F Policy, requiring the countersignature of a duly authorized agent before it would be valid.  Judge William Nickerson of this court held that Pennsylvania law governed the contract because it was countersigned in Pennsylvania.  *Id.* at 799.

Moreover, the Insurers' contention that ISG was not acting as its authorized agent in countersigning the policy contradicts the testimony of their own corporate designee.  *See* Mooney Dep. at 49.  It is also dispelled by applicable Maryland law.

To be sure, a broker often acts as the agent of the insured. *Porter Hayden II*, *supra*, 116 Md. App. at 675, 698 A.2d at 1201; *see Reserve Ins. Co. v. Duckett*, 240 Md. 591, 601, 214 A.2d 754, 760 (1965) ("As a general rule where one employs another to procure insurance such person is the agent of the insured."); *see also Sadler v. Loomis Co.*, 139 Md. App. 374, 394-95, 776 A.2d 25, 26-37 (2001). However, whether a broker is the agent of the insurer or the insured is an "*ad hoc* determination turning on the facts of each particular case." *Porter Hayden II*, 116 Md. App. at 675, 698 A.2d at 1201. Indeed, a broker "may . . . in some circumstances serve in a dual capacity, as an agent of the insured in procuring insurance but then as an agent of the insurer in delivering the policy and in collecting the premiums." *Id.*

For instance, in *Sun Insurance Office, Ltd. v. Mallick,* 160 Md. 71, 82, 153 A. 35, 40 (1931), the Maryland Court of Appeals stated:

> It is undoubtedly true that a broker may be the agent for both parties in respect to particular acts to be done in consummation of the contract of insurance. Here the delivery of the policy to the [insured], and the collecting or securing the payment of the premium, was the final act which put the contract in force. [The broker] was the agent of the [insured] in soliciting the insurance, and his representations effecting the formation of the policy were, as stated, binding upon the [insured]; but for the purpose of delivering the policy and collecting the premiums for the use of the [insurer] he was as certainly its agent.

"The rationale for this principle is that, even absent evidence of a consensual agency relationship between the insurer and the broker, the insurer, by sending the executed policy to the broker, has entrusted the broker with the delivery of the policy and the collection of the premium, thereby implicitly authorizing the broker to act on the insurer's behalf." *Commercial Union Ins. Co. v. Porter Hayden Co.*, 97 Md. App. 442, 453, 630 A.2d 261, 267 (1993) ("*Porter Hayden I*"), *vac'd on other grounds*, 339 Md. 150, 662 A.2d 691 (1995) (vacating with instructions to dismiss appeal for lack of final judgment).

In *Porter Hayden II*, 116 Md. App. at 675-76, 698 A.2d at 1201, the Maryland Court of Special Appeals found that the broker, a New York company, was only the agent of the insured, a Maryland company.  It reasoned that there was uncontested evidence that the broker served as the agent for the insured and there was evidence that no consensual agency relationship existed between the insurer and the broker.  *Id*.  Because the broker was solely an agent of the insured, the insurer's delivery of the policies to the broker in New York constituted delivery to the insured.  *Id*.  Therefore, the state in which the policy was delivered *to the broker*, as the insured's agent, was the place where the policy was delivered, and thus the *locus contractus*.  *Id*.; *accord Insights Trading Grp., LLC v. Fed. Ins. Co.*, Civ. No. RDB-10-340, 2010 WL 2696750, at *4 (D. Md. July 6, 2010) (holding that the *locus contractus* of the contract was New York because the policies were delivered to the agent/broker in New York before the insured, a Maryland company, received them); *Travelers Indem. Co. v. Allied-Signal, Inc.*, 718 F. Supp. 1252, 1253 (D. Md. 1989) (stating that New York law was the controlling law because the insured's broker was located there and took receipt of the policy before it was sent to the insured in New Jersey). Indeed, in *Porter Hayden II*, New York was the place of the making of the contract, despite the fact that the insured was based in Maryland and took receipt of the policy in Maryland.  *Id.*[12]

Unlike *Porter Hayden II*, where the evidence showed that there was no consensual agency relationship between the insurer and broker, there is ample, uncontroverted evidence in this case that Arrowpoint and ISG had a consensual agency relationship.  Mr. Mooney testified that ISG acted as an authorized representative that was duly authorized to countersign the A&F Policy.  Moreover, Mr. Dixon averred that he understood that ISG was acting as A&F's agent in

---

[12] The *Porter Hayden II* Court ultimately decided that *lex loci contractus* did not control in that case, and that Maryland law applied under the doctrine of *renvoi*.  Nevertheless, the *Porter Hayden II* Court's analysis of *lex loci contractus* remains salient.

countersigning the policy before delivering it to Baker's Express.   It is also notable that the policy premiums were sent to ISG.

However, it does not matter whether ISG was the agent of Baker's Express or of A&F, because the Insurers cannot prevail under either scenario.   If ISG was A&F's agent, its act of countersigning the A&F Policy in Maryland was the last act necessary to effectuate the policy. On the other hand, if ISG was not A&F's agent but was, instead, the agent of Baker's Express, the result of the *lex loci* analysis is the same as in *Porter Hayden II*: the policy was delivered to ISG, as the agent of Baker's Express, in Maryland.   A&F's delivery of the policy to ISG constituted delivery of the policy to Baker's Express, and so the policy was delivered in Maryland.   Either way, Maryland was the *locus contractus*.

Even if I were to consider the location where the A&F Policy was ultimately delivered to Baker's Express, it was delivered to Baker's Express at Metroplex Harriman's offices in New York, not New Jersey.   Mr. Parker's testimony was that the Metroplex Harriman office retained the insurance policies.   Therefore, in any event, the *locus contractus* was not New Jersey.

Moreover, as to where the premiums were paid, the premiums were sent by Baker's Express to ISG in Maryland, and Maryland case law suggests (although it is not entirely beyond doubt) that the place "where the premiums are paid" for purpose of a *lex loci* analysis is the place where the premiums are received by the insurer or its agent.   In other words, the *locus contractus* is the place where the premiums are paid *to* the insurer, not where the premiums are paid *by* the insured.   *See, e.g.*, *Wilson*, *supra*, 198 Md. App. at 463, 18 A.3d at 116 (stating that, where insurer "received the premium payments" in Illinois, "the contract was formed in Illinois, and Illinois law applies to its construction"); *CIGNA Property & Cas. Cos. v. Zeitler*, 126 Md. App. 444, 480, 730 A.2d 248, 268 (1999) (holding that Maryland law governed insurance policy

where "all of the premiums were paid by [insured] to [broker] in Annapolis").  *But see Bahn v. Chicago Motor Club Ins. Co.*, 98 Md. App. 559, 568-69, 634 A.2d 63, 67 (1993) (stating, in context of personal jurisdiction, that insurance company transacted business in Maryland by insuring a Maryland insured because the "place of contracting is the state to which the policy is delivered and *from* which the premiums were paid") (emphasis added).

The Insurers suggest that a court may look to state law referenced in the insurance policy provisions themselves, or to "overriding public policy considerations," in making a choice of law analysis, Insurers' Motion at 8, but none of the cases they cite are helpful to their position.  In *Sting Security, Inc. v. First Mercury Syndicate, Inc.*, 791 F. Supp. 555, 558 & n.2 (D. Md. 1992), Judge J. Frederick Motz concluded that Virginia law governed, although the parties did not brief the matter of which state's law applied.  Judge Motz said: "While it is not clear where Sting paid its premiums, both policies were issued to Sting at its address in Arlington, Virginia. Additionally, the policies contain provisions specifically relevant to Virginia insurance regulation.  Therefore, it appears that the law of Virginia governs this dispute."  *Sting* does not support the proposition that a policy whose *locus contractus* clearly was Maryland can be governed by the law of another state if it contains provisions relevant to the foreign state's insurance regulations.  Similarly, in *Miller v. St. Paul Mercury Ins. Co.*, 709 F. Supp. 2d 397, 401 (D. Md. 2009), Judge Richard D. Bennett concluded that New York law applied (apparently in the absence of a suggestion to the contrary by any party).  He relied on the fact that "the terms of the policy refer to the laws of New York," *in addition to* the fact that the policy "was issued to a New York company, Upper Hudson, and was issued via a New York agent."

Although it is true that Maryland courts "have applied [a] public policy exception analysis under the *lex loci contractus* rule," *Erie Ins. Exchange v. Heffernan*, 399 Md. 598, 630,

925 A.2d 636, 654 (2007), the Insurers have not identified any compelling reason that application of Maryland law in this case would be offensive to public policy.  "[F]or Maryland public policy to override the *lex loci contractus* rule, the public policy must be very strong and not merely a situation in which Maryland law is different from the law of another jurisdiction." *Kramer v. Bally's Park Place, Inc.*, 311 Md. 387, 390, 535 A.2d 466, 467 (1988) (citations omitted).

In *Travelers Indemnity Co. v. Allied-Signal, Inc.*, 718 F. Supp. 1252 (D. Md. 1989), the case regarding the public policy exception on which the Insurers principally rely, the serious question that Judge Motz confronted was whether "Maryland public policy mandates the denial of insurance coverage to any company which deliberately pollutes the environment, regardless of what the law of another jurisdiction would decree." *Id.* at 1254.  He declined to resolve that question without a factual record developed through discovery, but observed that the choice of law decision involved important public policy considerations, in contrast to "ordinary commercial cases" where "public policy is furthered by the *lex loci contractus* rule because it provides a certainty upon which contracting parties can rely."  *Id.* at 1255.  Judge Motz commented: "[I]t would appear to be an unseemly derogation of its sovereign power for a state to decline to apply its own substantive law to matters which directly impact upon its physical environment and which seriously affect the welfare of its citizens." *Id.*  Simply put, the issues of liability for pre-tender litigation expenses presented in this case are a far cry in terms of public policy importance from the environmental pollution issues in *Allied-Signal*.

The Insurers' reliance on the doctrine of *renvoi* is also unavailing.  Maryland courts recognize a "limited form of *renvoi*." *American Motorists*, *supra*, 338 Md. at 569, 659 A.2d at 1299.  In *American Motorists*, a *lex loci* analysis dictated the application of Illinois law.  Illinois,

however, had adopted the "most significant relationship" test for choice of law in contract cases, and Maryland had the most significant relationship to the contractual relationship at issue, although Maryland was not the *locus contractus*. In that situation, the Maryland Court of Appeals held that Maryland law should apply. Adopting a "limited form of *renvoi*," *id.* at 574, 659 A.2d at 1302, the *American Motorists* Court directed Maryland courts to "apply Maryland substantive law when the place of contracting would apply Maryland law to resolve the dispute had suit been filed in that jurisdiction." *Id.* at 577-78, 659 A.2d at 1303. Thus, *renvoi* in Maryland is a one-way street: if it applies, it can only result in application of the law of Maryland. This is, in part, because a threshold requirement for application of the *renvoi* doctrine is that "the forum court's [*i.e.*, Maryland's] choice-of-law rules would apply the substantive law of a foreign jurisdiction to the case before the forum court." *Id.* at 574, 659 A.2d at 1302. That threshold requirement is not met in this case. As discussed above, Maryland's choice of law rules result here in application of Maryland substantive law.

What the Insurers desire is not *renvoi*, but the application of the "most significant relationship" test itself. But, as the *American Motorists* Court reaffirmed, "Maryland courts have never applied the 'most significant relationship' test." *Id.* at 572, 659 A.2d at 1301.[13]

---

[13] As the Insurers point out, the *American Motorists* Court recognized a trend away from strict application of *lex loci contractus* and commented: "With modern technology and modern business practices, the place of contracting becomes less certain and more arbitrary." *American Motorists*, 338 Md. at 580, 659 A.2d at 1305. The Insurers appear to urge this Court to accept what the Insurers perceive as an invitation from the Maryland Court of Appeals to "move[ ] away from rigidly following the rule of *lex loci contractus*." *Id.* at 581, 659 A.2d at 1305. However, the *American Motorists* Court went on to say, *id.* (underline emphasis added):

> We are not yet . . . ready to jettison *lex loci contractus* except in those instances already noted. *Lex loci contractus* is still the law in the majority of jurisdictions, although there is a significant modern erosion of the rule. If that erosion continues, however, this Court may, in the proper case, have to reevaluate what the best choice-of-law rules ought to be to achieve simplicity, predictability, and uniformity. *(cont'd on next page...)*

Accordingly, because Maryland was the *locus contractus* of the A&F Policy, Maryland law governs this Court's interpretation of the policy.

### C.  Duty to Defend

As a fallback position, the Insurers argue that, if Maryland law applies, they in fact had no duty to defend the Barnes Suit in any event, and thus, *a fortiori*, cannot be liable for pre-tender litigation expenses because they were not actually liable for any litigation expenses at all. The Insurers' argument has two prongs.  First, they contend that Exclusion C7 of the A&F Policy precluded any duty to defend.  As noted, Exclusion C7 stated that the policy does not cover "damages arising out of coercion, criticism, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination against or termination of any employee, or any personnel practices, policies, acts or omissions."  A&F Policy at 70.  Although the New Jersey Part Two Employers Liability Endorsement (the "New Jersey Endorsement")[14] abrogated Exclusion C7 with respect to bodily injury, the Insurers argue that the New Jersey Endorsement would only apply if the A&F Policy were governed by New Jersey law.  Second, the Insurers reason that, because the A&F Policy insured only Baker's Express itself, and not its employees, the Insurers had no duty to defend the claims against the three supervisors who were Baker's Express's co-defendants in the Barnes Suit.  In sum, the Insurers argue that they had no duty to defend any of the claims against any of the defendants in the Barnes Suit.  Baker's Express counters that, interpreting the A&F Policy under Maryland law, Exclusion C7 does not apply to

---

When sitting in diversity, a federal court's obligation is to "predict how [the state's highest] court would rule if presented with the issue."  *Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002).  This Court's role is not to exercise a decision-making prerogative that the forum state's highest court has expressly reserved to itself.

[14] As discussed, *supra*, there are several endorsements to the A&F Policy that mention New Jersey.  However, because the New Jersey Part Two Employers Liability Endorsement is the only endorsement that is salient to the duty to defend, for the sake of brevity, I refer to it in this portion of the Discussion as the "New Jersey Endorsement."

bodily injury claims, and the Insurers had a duty to defend against all claims as to all defendants in the Barnes Suit.

Resolution of the parties' dispute requires interpretation of the A&F Policy. "[I]nterpretation of private contracts is ordinarily a question of state law." *Volt Info. Sci., Inc. v. Bd. of Trustees of Leland Stanford Univ.*, 489 U.S. 468, 474 (1989); *accord James v. Circuit City Stores, Inc.*, 370 F.3d 417, 421-22 (4th Cir. 2004); *see also French v. Assurance Co.*, 448 F.3d 693, 700 (4th Cir. 2006) (stating, in diversity declaratory action regarding insurance coverage, "we apply . . . Maryland's substantive law regarding the interpretation of an insurance policy" where the *locus contractus* of the policy is Maryland).

Maryland law is well settled that "the interpretation of an insurance policy is governed by the same principles generally applicable to the construction of other contracts." *Mitchell v. AARP*, 140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001); *see State Farm Mut. Ins. Co. v. DeHaan*, 393 Md. 163, 193, 900 A.2d 208, 225-26 (2006); *Cole v. State Farm Mut. Ins. Co.*, 359 Md. 298, 305, 753 A.2d 533, 537 (2000). Accordingly, "'ordinary principles of contract interpretation apply.'" *Megonnell v. United Servs. Automobile Ass'n*, 368 Md. 633, 655, 796 A.2d 758, 772 (2002) (citation omitted); *see Dutta v. State Farm Ins. Co.*, 363 Md. 540, 556, 769 A.2d 948, 957 (2001).

In "'deciding the issue of coverage under an insurance policy, the primary principle of construction is to apply the terms of the insurance contract itself.'" *Universal Underwriters Ins. Co. v. Lowe*, 135 Md. App. 122, 137, 761 A.2d 997, 1005 (2000) (quoting *Bausch & Lomb, Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 779, 625 A.2d 1021 (1993)). The Maryland Court of Appeals has explained that judicial "interpretation of insurance contracts to determine the scope and limitations of the insurance coverage, like any other contract, begins with the language

employed by the parties." *MAMSI Life & Health Ins. Co. v. Callaway*, 375 Md. 261, 279, 825 A.2d 995, 1005 (2003).   Generally, Maryland courts "analyze the plain language of [an insurance] contract according to the words and phrases in their ordinary and accepted meanings as defined by what a reasonably prudent lay person would understand them to mean." *Universal Underwriters Ins. Co.*, 135 Md. App. at 137, 761 A.2d at 1005; *see Walk v. Hartford Cas. Ins. Co.*, 382 Md. 1, 14-15, 852 A.2d 98, 106 (2004); *Litz v. State Farm*, 346 Md. 217, 224, 695 A.2d 566, 569 (1997).

However, "[i]n order to determine the intention of the parties to an insurance contract, the instrument must be construed as a whole and 'the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution' must be examined." *United Services Auto. Ass'n v. Riley*, 393 Md. 55, 79, 899 A.2d 819, 833 (2006) (quoting *Chantel Assocs. v. Mt. Vernon Fire Ins. Co.*, 338 Md. 131, 142, 656 A.2d 779, 784 (1995)).   If there is evidence that the parties intended to ascribe a special or technical meaning to certain words used in an insurance contract, those words are construed in accordance with that understanding. *Valliere v. Allstate Insurance Co.*, 324 Md. 139, 142, 596 A.2d 636, 638 (1991)   ("When a policy defines a term in a manner which differs from the ordinary understanding of that term, the policy definition controls."); *see also Walk*, 382 Md. at 14-15, 852 A.2d at 106; *Dutta*, 363 Md. at 556, 769 A.2d at 957.

If the court deems the provisions of an insurance policy unambiguous, the meaning of the terms is determined by the court as a matter of law.  *Cole*, 359 Md. at 305, 753 A.2d at 537.   In that circumstance, "'a court has no alternative but to enforce those terms.'"  *Megonnell*, 368 Md. at 655, 796 A.2d at 772 (quoting *Dutta*, 363 Md. at 557, 556 A.2d at 1138).   But, if a contractual term is ambiguous, the court may consult "extrinsic sources" to ascertain the meaning.  *Cole*, 359

Md. at 305, 753 A.2d at 537.  A policy term is considered "ambiguous if, to a reasonably prudent person, the term is susceptible to more than one meaning."  *Id.* at 306, 753 A.2d at 537.  The treatise, G.J. Couch, 2 COUCH CYCLOPEDIA OF INSURANCE LAW (2d ed. 1959), on which the Maryland appellate courts have relied, states: "The criterion is ambiguity from the standpoint of a layman, not from that of a lawyer." *Id.*, § 15:84, at 416-418.

"'Maryland does not follow the rule that insurance policies should, as a matter of course, be construed against the insurer.'"  *Megonnell*, 368 Md. at 655, 796 A.2d at 771 (citation omitted); *see Bushey v. Northern Assurance Co. of America*, 362 Md. 626, 632, 766 A.2d 598, 601 (2001); *Collier v. MD-Individual Practice Ass'n*, 327 Md. 1, 5, 607 A.2d 537, 539 (1992). But, "if ambiguity is determined to remain after consideration of extrinsic evidence, 'it will ordinarily be resolved against the party who drafted the contract,' where no material evidentiary factual dispute exists." *Clendenin Bros., Inc. v. U.S. Fire Ins. Co.*, 390 Md. 449, 459-60, 889 A.2d 387, 394 (2006).  *See Callaway*, 375 Md. at 280, 825 A.2d 995, 1005-06 ("[W]hen a term in an insurance policy is found to be ambiguous, the court will construe that term against the drafter of the contract which is usually the insurer.").

Regarding the insurer's duty to defend, the Maryland Court of Appeals articulated a "potentiality rule" in *Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 407-08, 347 A.2d 842, 850 (1975) (emphasis added) (internal citations omitted):

> The obligation of an insurer to defend its insured under a contract provision . . . is determined by the allegations in the tort actions.  If the plaintiffs in the tort suits allege a claim covered by the policy, the insurer has a duty to defend. Even if a tort plaintiff does not allege facts which clearly bring the claim within or without the policy coverage, the insurer still must defend if there is a *potentiality* that the claim could be covered by the policy.

*Accord Aetna Casualty & Surety Co. v. Cochran*, 337 Md. 98, 102-03, 651 A.2d 859, 861 (1995).

The Maryland Court of Appeals further elucidated the potentiality rule as a two-part test

in *St. Paul Fire & Marine Ins. v. Pryseski*, 292 Md. 187, 193, 438 A.2d 282, 285 (1981):

> In determining whether a liability insurer has a duty to provide its insured with a defense in a tort suit, two types of questions ordinarily must be answered: (1) what is the coverage and what are the defenses under the terms and requirements of the insurance policy? (2) do the allegations in the tort action potentially bring the tort claim within the policy's coverage? The first question focuses upon the language and requirements of the policy, and the second question focuses upon the allegations of the tort suit.

*See also Moscarillo v. Professional Risk Management Services, Inc.*, 398 Md. 529, 538, 921

A.2d 245, 250 (2007); *Walk*, 382 Md. at 15, 852 A.2d at 106; *Cochran*, 337 Md. at 103-04, 651

A.2d at 862.

The "duty to defend is broader than the duty to indemnify," because "the duty to defend

depends only upon the facts as alleged" in a tort suit, whereas "the duty to indemnify depends

upon liability." *Walk*, 382 Md. at 15, 852 A.2d at 106. The Maryland high court reiterated in

*BGE Home Products & Services, Inc. v. Owens*, 377 Md. 236, 246, 833 A.2d 8, 14 (2003):

> "The promise to defend the insured, as well as the promise to indemnify, is the consideration received by the insured for payment of the policy premiums. Although the type of policy here considered is most often referred to as liability insurance, it is 'litigation insurance' as well, protecting the insured from the expense of defending suits brought against him."

*Id.* at 246, 833 A.2d at 14 (quoting *Brohawn*, 276 Md. at 409-410, 347 A.2d at 851).

The parties agree that Exclusion C7 to the A&F Policy, barring coverage for damages

arising, *inter alia*, out of discrimination against an employee or personnel practices, acts, or

omissions, precludes coverage for the Barnes Suit unless the New Jersey Endorsement applies.

That endorsement provided, *inter alia*, that "[w]ith respect to Exclusion C7 we will defend any

claim, proceeding or suit for damages where bodily injury is alleged." *Id.* at 84. The New Jersey

Endorsement also stated: "This endorsement applies only to the insurance provided by Part Two

(Employers Liability Insurance) because New Jersey is shown in Item 3.A. [*i.e.*, the designation of 'Covered States'] of the Information Page." *Id.*

The Insurers explain that the New Jersey Endorsement is a product of the New Jersey Supreme Court's decision in *Schmidt v. Smith*, 713 A.2d 1014 (N.J. 1998). In *Schmidt*, the court recounted that, under New Jersey's statutory scheme for worker's compensation, the New Jersey "Legislature has required that every employer carry Workers' Compensation insurance," and that the statutorily mandated policies "must cover not only claims for compensation prosecuted in the Worker's Compensation court, but also claims for work-related injuries asserted in a common law court." *Id.* at 1016-17 (citing statute). The thrust of the insurance mandate under New Jersey's worker's compensation statute is that "the terms of a policy issued pursuant to [the statute] cannot conflict with the statutory mandate that there be coverage provided for all occupational injuries." *Id.* at 1017. Moreover, the *Schmidt* Court observed that, in New Jersey, "[e]mployers liability coverage . . . 'is traditionally written in conjunction with workers' compensation and is intended to serve as a "gap-filler" providing protection to the employer in those situations'" where the worker's compensation statute does not apply. *Id.* (citation omitted).

At issue in *Schmidt* was whether a worker's compensation and employer's liability insurer was required to defend and indemnify its insured against an employee's claim of workplace sexual harassment (involving a sexual assault committed by the president of the employer-insured) that resulted in bodily injury to the employee. *See id.* at 1015-16. The insurance policy at issue contained an exclusion virtually identical to Exclusion C7 in the A&F Policy (indeed, it was also denominated "Exclusion C7"). *See id.* at 1017. The New Jersey Supreme Court held that application of Exclusion C7 to bar coverage for the employee's claim

would violate New Jersey public policy.   It reasoned, *id.* at 1018 (emphasis added) (internal citations omitted):

> The employers liability section of the [policy] was to provide compensation for bodily injuries to workers falling outside the workers' compensation system— injuries intentionally caused by fellow employees, for example . . . .   Exclusion C7 in the employers liability section disclaims coverage for a class of discomforts that one typically would not associate with bodily injury—criticism, demotion, evaluation, and defamation, for example—and that one typically would not expect to be covered by a scheme designed to insure that employees' bodily injuries be compensated.   *The exclusion is valid as long as the liability arising from those discomforts is not related to bodily injury.*   In this case, however, [the employer's] liability was primarily related to the personal injuries that [the employee] suffered as a result of [the president's] conduct. . . .   *To the extent Exclusion C7 would otherwise operate to deny coverage for such injuries, the exclusion violates the public policy underlying the workers' compensation scheme and is therefore void.*

The Insurers argue that A&F was obligated by the *Schmidt* decision to include in the New Jersey Exclusion the "bodily injury" carve-out from Exclusion C7.   Moreover, the Insurers observe that, in contrast to the New Jersey Supreme Court in *Schmidt*, courts in other jurisdictions—and in Maryland in particular—have not held that Exclusion C7 is invalid as applied to bodily injury claims.   For instance, they cite *Parts, Inc. v. Utica Mutual Insurance Co.*, 602 F. Supp. 2d 617 (D. Md. 2009), in which Judge Roger W. Titus of this court, applying Maryland law, held that an exclusion quite similar to Exclusion C7 precluded coverage for an insured employer in an employee's suit for sexual harassment by a supervisor.

Judge Titus observed that, under Maryland law, an insurer ordinarily may "'freely limit liability and impose reasonable conditions upon the obligations it assumes by contract, provided that the exclusion does not violate statutory mandates or public policy.'"   *Id.* at 622 (quoting *Megonnell v. United Servs. Auto. Ass'n*, 368 Md. 633, 656, 796 A.2d 758, 772 (2002)).   He held that "the plain and unambiguous language of the employment-related practices exclusion supports a finding that the exclusion applies in this case to bar coverage."   *Parts*, 602 F. Supp. 2d

at 622.  Judge Titus reasoned: "The complaint filed by [the employee] alleges a bodily injury, i.e., the physical battery leading up to and including the sexual act," and the alleged bodily injury "arose out of [the supervisor's] employment practices of harassment and humiliation that was directed at her as well as [the employer's] employment-related omission or negligent supervision of [the supervisor] in its failure to take immediate and appropriate corrective action when on notice of [the supervisor's] sexually harassing behavior."  *Id.*[15]

According to the Insurers, the New Jersey Exclusion was intended to bring the A&F Policy into compliance with New Jersey law, as construed by the New Jersey Supreme Court in *Schmidt*.  Insurers' Reply at 13.  In the Insurers' view, the New Jersey Endorsement "has no application if the coverage issues here with regard to the duty to defend are governed by Maryland law."  *Id.* at 15.  They reason: "Baker's Express should not be permitted on the one hand to assert that Maryland law controls in order to recover pre-notice defense costs, and on the other hand assert that the New Jersey [E]ndorsement should apply in order for Baker's Express to avoid unfavorable case law upholding the equivalent of the A&F [E]xclusion C7."  *Id.*

However, as Baker's Express points out, the New Jersey Endorsement stated: "With respect to Exclusion C7 we will defend *any* claim, proceeding or suit for damages where bodily injury is alleged."  A&F Policy at 84 (emphasis added).  By its plain text, the New Jersey Endorsement did not limit its application to claims governed by New Jersey law.  Although the New Jersey Endorsement stated that it was included in the policy "because New Jersey" is one of the "Covered States," *id.*, that language does not limit the reach of the endorsement—it merely explains why the endorsement was added to the policy.  And, although the focal point of the

---

[15] Notably, it appears that, unlike in *Schmidt*, the insured in *Parts* did not present an argument that the exclusion violated public policy.  Thus, there is not really any tension between the decisions in *Parts* and *Schmidt*.  Like the *Parts* Court, the *Schmidt* Court held that Exclusion C7, by its terms, precluded coverage; however, the *Schmidt* Court went on to hold that application of the exclusion violated public policy—an issue that was not presented in *Parts*.

policy's coverage was New Jersey, the A&F Policy expressly contemplated that claims might arise in other states. The policy contained the provisions for "Other States Insurance," discussed, *supra*. Moreover, although coverage under the Employer's Liability Insurance section of the policy applied only to bodily injury arising out of employment that was "necessary or incidental to [the insured's] work in" one of the "Covered States" (*i.e.*, New Jersey), that section of the policy also expressly provided that A&F would defend a qualifying suit brought anywhere "in the United States of America, its territories or possessions, or Canada." A&F Policy at 69.[16]

I am unaware of any Maryland decision analogous to *Schmidt*, invalidating an exclusion akin to Exclusion C7. But, interpreting the A&F Policy under its plain terms, in accordance with Maryland law, the policy expressly carves out bodily injury claims from Exclusion C7. Although the carve-out is included in the New Jersey Exclusion for reasons based on New Jersey law, the carve-out contains no language limiting its application geographically. Therefore, the Insurers' argument is without merit.

There is also no merit to the Insurers' contention that it had no duty to defend the Barnes Suit because it had no duty to defend the individual defendants. Under Maryland's potentiality rule, if "*any* claims potentially come within the policy coverage, the insurer is obligated to defend *all* claims 'notwithstanding alternative allegations outside the policy's coverage, until such times [sic] . . . that the claims have been limited to ones outside the policy coverage.'" *Utica Mut. Ins. Co. v. Miller*, 130 Md. App. 373, 383, 746 A.2d 935, 940 (emphasis added) (some internal quotation marks omitted) (quoting *Southern Md. Agric. Assoc., Inc. v. Bituminous Cas. Corp.*, 539 F.Supp. 1295, 1299 (D. Md. 1982), in turn quoting *Steyer v. Westvaco Corp.*, 450 F. Supp. 384, 389 (D. Md. 1978)), *cert. denied*, 359 Md. 31, 753 A.2d 3 (2000); *accord*

---

[16] As Baker's Express points out, the Barnes Suit was based on allegations of conduct in New Jersey and was litigated in New Jersey state and federal courts.

*Zurich Ins. Co. v. Principal Mut. Ins. Co.*, 134 Md. App. 643, 650, 761 A.2d 344, 348 (2000); *see also* 3 NEW APPLEMAN ON INSURANCE LAW LIBRARY ED. § 17.01 (2012 Supp.) ("Virtually all courts agree that if an action involves both potentially covered and noncovered claims—a so-called 'mixed' action—the insurer must defend the entire action.").

To be sure, in the context of an insured's suit for damages representing litigation expenses already incurred (rather than for breach of the insurer's duty to defend a suit, *per se*), the Maryland Court of Appeals had held that, to the extent that the litigation expenses were paid for both covered and uncovered claims, an "insured has the burden of establishing that a given item of legal service or expense [for an uncovered claim] was reasonably related to the defense" of the covered claims. *Continental Cas. Co. v. Bd. of Educ. of Charles County*, 302 Md. 516, 536, 489 A.2d 536, 546 (1985); *see also id.* at 527-31, 489 A.2d at 542-43 (distinguishing the duty to defend context). An insured is entitled to reimbursement for expenses for the defense of covered claims and for expenses for uncovered claims that are "reasonably related" to the covered claims. *Id.* at 532, 489 A.2d at 544. The *Continental* Court articulated the following standard for when an expense is "reasonably related" to a covered claim: "Legal services and expenses are reasonably related to a covered count if they would have been rendered and incurred by reasonably competent counsel engaged to defend a suit against the [insured] arising out of the same factual background as did the [actual] suit but which alleged only the matters complained of in [the covered] counts . . . ." *Id.*

In *Federal Realty Investment Trust v. Pacific Insurance Co.*, 760 F. Supp. 533, 537 (D. Md. 1991), the court held that the "reasonably related" standard elucidated in *Continental* for defense of covered and non-covered *claims* should also apply to cases involving covered and non-covered *parties*. The claims against the individual employees in the Barnes Suit clearly

were "reasonably related" to the claims against Baker's Express.  Indeed, the claims were inextricably intertwined.  As Baker's Express points out, its liability in the Barnes Suit was based primarily on vicarious liability for the alleged actions of its supervisory employee co-defendants.

Critically, the Insurers have not pointed to any particular expenses that are specifically attributable to the defense of the individual defendants in the Barnes Suit or that were not "reasonably related" to the covered claims against Baker's Express.  Nor have they identified any defenses that were asserted in the Barnes Suit that applied only to the individual defendants. Even if the case had proceeded only against Baker's Express, the same expenses relative to the individual defendants likely would have been incurred, because the supervisors would have been witnesses whom counsel would have needed to interview.

In sum, the Insurers have not suggested any way in which defense counsel in the Barnes Suit would have been able to litigate the case differently or less expensively in the absence of the individual defendants.  In the absence of such a showing, the Insurers have failed to generate any disputed issue of material fact for resolution by a fact finder.  In my view, the non-covered claims against the individual defendants in the Barnes Suit are the proverbial red herring.

### D.  Miscellaneous Liability Contentions

The Insurers articulate two other rather conclusory arguments as to why they are not liable for Baker's Express's reasonable pre-tender litigation expenses.  Neither claim withstands scrutiny.

First, the Insurers contend that they were "releasees" under the settlement agreement that resolved the Barnes Suit, *see* Settlement Agreement & General Release, Ex.T to Insurers' Motion (ECF 31-20), and thus should have no liability beyond the amounts they contributed to the settlement.  In my view, this argument is specious.  By the plain terms of the settlement

agreement, Baker's Express's "insurers" were released from further liability to <u>Mr. Barnes</u>. *See id.* at 3-5. The settlement agreement simply did not address liability between Baker's Express and its insurers. Indeed, none of the Insurers—*i.e.*, A&F, Arrowpoint Capital, Arrowood Indemnity, or Arrowood Surplus—was even identified by name in the release of liability in the settlement agreement. *See id.* The Insurers were not named as parties to the settlement agreement, *id.* at 1, and none of them was a signatory to it. *See id.* at 8-9. Moreover, correspondence submitted as an exhibit by the Insurers, which was sent to them by their coverage counsel, Kevin E. Wolff, Esq. of Coughlin Duffy, LLP, on January 25, 2008, shortly after the settlement, demonstrates that no agreement had been reached as to the issue of Baker's Express's entitlement to pre-tender litigation expenses. *See* Letter of Kevin E. Wolff, Ex.R to Insurers' Motion (ECF 31-18). Mr. Wolff stated, *id.* at 2:

> Subsequently [*i.e.*, after the execution of the settlement agreement], the insured's counsel asked whether there was any 'flexibility' in our pre-tender defense cost position. I told him that we remain firmly committed to the position that pre-tender defense costs are not the responsibility of Arrowpoint but that we never rule out the possibility of trying to resolve any dispute on an amicable basis.

Second, the Insurers claim that the coverage of the A&F Policy did not apply because of an "Other Insurance" provision contained in the New Jersey Endorsement.[17] The "Other Insurance" provision stated, in relevant part: "This insurance . . . is excess over any other applicable insurance with respect to claims for bodily injury arising out of employer practices, policies, acts or omissions enumerated in C-7 above, whether such other insurance is stated to be primary, contributory, excess, contingent, or otherwise." A&F Policy at 84. In their reply brief, the Insurers argue that, "even if this New Jersey [E]ndorsement had any application to coverage

---

[17] The "Employers Liability Insurance" section of A&F Policy's core "Policy" form contained an "Other Insurance" provision, *see* A&F Policy at 71, but the "Other Insurance" provision of the New Jersey Endorsement expressly superseded the provision in the core form. *See id.* at 84.

issues under Maryland law, the coverage provided is limited, and would be excess over the Zurich policy until coverage under the Zurich policy was exhausted."  Insurers' Reply at 15.

This sentence is the sum total of their argument on the point.  As indicated, the Insurers did not assert this argument until their reply brief.  "The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered." *Clawson v. FedEx Ground Package Sys., Inc.,* 451 F. Supp. 2d 731, 734 (D. Md. 2006).  In any event, the Insurers' argument lacks merit on its face.  The "Other Insurance" provision makes the A&F Policy "excess over any other applicable insurance with respect to *claims for bodily injury* arising out of employer practices, acts or omissions" enumerated in Exclusion C7.  A&F Policy at 84 (emphasis added).  As discussed, the Zurich Policy applied to employment practices, but expressly *excluded* coverage for bodily injury.  Thus, the Zurich Policy was not "applicable" primary insurance "with respect to claims for bodily injury."  Rather, the Zurich Policy and the A&F Policy were complementary: the Zurich Policy covered employment practices but excluded bodily injury, while the A&F Policy covered only bodily injury claims, and otherwise excluded employment practices.

### E.  Litigation Costs – Prejudice and Reasonableness

As discussed, Maryland law permits an insured to recover pre-tender litigation expenses from its insurer, so long as the insurer has not suffered actual prejudice from the insured's delay in tendering the claim.  The relevant questions are: "[W]as it reasonable, under the circumstances, for the insured to have incurred the expense; was the expense reasonable; [and] did the expense materially exceed that which the insurer would likely have incurred in any event had the notice been given earlier?"  *Sherwood Brands*, *supra*, 347 Md. at 48-49, 698 A.2d at 1086.  For example, an insurer can show prejudice where the insured has employed  "counsel or

other litigation support persons at rates that [are] substantially in excess of those that would have otherwise been paid by the insurer had it been notified and undertaken the defense earlier." *Id.* at 49 n.7, 698 A.2d at 1086 n.7.

Of import here, the "insurer bears the burden of proof to show prejudice." *Prince George's County v. Local Gov't Ins. Trust*, 388 Md. 162, 188, 879 A.2d 81, 97 (2005). *See Allstate Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 363 Md. 106, 122, 767 A.2d 831, 840 (2001) ("An insurer may not disclaim coverage for either lack of notice or failure to cooperate unless it demonstrates that the deficiency has resulted in actual prejudice to the insurer."); *Rouse Co. v. Federal Ins. Co.*, 991 F. Supp. 460, 466 (D. Md. 1998) (same). The "'insurer must establish by a preponderance of affirmative evidence that the delay in giving notice has resulted in actual prejudice to the insurer.'" *Sherwood Brands*, 347 Md. 32, 42, 698 A.2d at 1082 (quoting statute).

There are some factual circumstances in which prejudice may be established as a matter of law. *See, e.g., Prince George's County*, 388 Md. at 190, 879 A.2d at 98 (holding that an insurer is "prejudiced as a matter of law when the insured notified the insurer after a judgment"). However, prejudice "'cannot be surmised or presumed from the mere fact of delay.'" *Porter Hayden II, supra*, 116 Md. App. at 668, 698 A.2d at 1197 (citation and emphasis omitted). An "'insurer will survive summary judgment only if it raises a genuine dispute as to whether it was prejudiced by the delay in notice. *Alleging only possible, theoretical, conjectural, or hypothetical prejudice is not enough.'" Id.* (emphasis in original) (internal citation and some internal quotation marks omitted); *accord Oliff-Michael v. Mutual Benefit Ins. Co.*, 262 F. Supp. 2d 602, 604 (D. Md. 2003).

In *General Accident Insurance Co. v. Scott*, 107 Md. App. 603, 608-10, 669 A.2d 773,

775-77 (1996), *cert. denied*, 342 Md. 115, 673 A.2d 707 (1996), the insured did not notify the insurer of a claim until twenty-nine months after the accident giving rise to the claim. The insurer contended that it was prejudiced by the delay, *id.* at 610, 669 A.2d at 777, because it could not fully investigate the underlying facts, evaluate its potential exposure, participate in the decision as to whether to submit the case to arbitration, and decide whether to set high/low parameters. *Id.* at 616, 669 A.2d at 779. The Maryland Court of Special Appeals concluded that the insurer's allegations were insufficient to show that it suffered actual prejudice because "conclusory allegations about difficulties and inconveniences that would result from *any* delay in notification are not sufficient" to create a material dispute of fact with respect to the issue of prejudice. *Id.* (emphasis in original).

Here, the Insurers make three assertions with regard to the reasonableness of the litigation expenses incurred pre-tender. They contend that they should not be liable for litigation expenses associated with the defense of the individual defendants in the Barnes Suit. They also argue that there was unnecessary duplication of effort by Miles & Stockbridge and its local New Jersey counsel, McCarter & English. And, they assert that, in some instances, Miles & Stockbridge inappropriately billed at attorneys' rates for administrative tasks.

As I see it, the Insurers have failed to raise a triable issue of material fact as to the reasonability of the pre-tender attorneys' fees. The Insurers' claim regarding the expenses associated with the individual defendants fails for reasons similar to those that defeat their related assertion concerning the substantive duty to defend, discussed earlier. It is evident that Baker's Express's alleged liability in the Barnes Suit was intertwined with that of the employee-defendants. And, as indicated, the Insurers have not pointed to any specific expenses that are assignable solely to the individual defendants.

With regard to the issue of duplication of effort by local counsel, a review of the pre-tender invoices that were submitted by Miles & Stockbridge, defense counsel for Baker's Express in the Barnes Suit, shows that no fees of local counsel, McCarter & English, were billed to Baker's Express before the tender of the lawsuit to Arrowpoint in April 2007. *See* Ex.M to Insurers' Motion (ECF 31-13); *see also* Affidavit of Paul Mark Sandler, Esq. ¶ 7 ("Sandler Aff."), Ex.I to Baker's Motion (ECF 33-11). As the Insurers point out, Miles & Stockbridge attorneys billed approximately $7,000 for their own communications to local counsel during the pre-tender period. But, the Insurers have not proffered any factual showing that communication with local counsel was unnecessary, unreasonable, or duplicative. And, it is clear that Baker's Express was not double-billed by local counsel.

Baker's Express has submitted an affidavit of Paul Mark Sandler, Esq. as an expert on the reasonability of the fees charged by Miles & Stockbridge. *See* Sandler Aff. Mr. Sandler opines, based on "a reasonable degree of certainty," that the tasks and amount of time charged for each task by Miles & Stockbridge were reasonable under the circumstances, and that the hourly rates charged by counsel were reasonable in light of counsel's experience and comparable market rates. *See id.* ¶¶ 4-5. Mr. Kraus, of Miles & Stockbridge, was the lead defense counsel in the Barnes Suit, and the attorney who incurred most of the pre-tender billable hours. He charged a base hourly rate of $455, which was discounted either to $390 per hour or by a percentage reduction of 10% (*i.e.*, to approximately $410 per hour) on several of the pre-tender invoices. *See* Ex.M to Insurers' Motion. Mr. Kraus has been in legal practice for over thirty years, since 1976. *See* Sandler Aff. ¶ 6. As a benchmark, $400 is the upper limit of the range of hourly rates for attorneys admitted to the bar for fifteen years or more that is considered presumptively reasonable under this Court's Guidelines for analysis of attorneys' fees. *See* Appendix B to the

Local Rules.   However, the Insurers have not contended that Mr. Kraus's hourly rate was unreasonable.

It is also salient that Arrowpoint's coverage counsel prepared a reasonableness analysis of the pre-tender fees submitted by Miles & Stockbridge, which Baker's Express has submitted as an exhibit.   *See* Ex.J to Baker's Motion (ECF 33-12).   Of the $267,242.57 in pre-tender defense costs invoiced by Miles & Stockbridge, Arrowpoint's coverage counsel concluded that $209,632.54 was reasonable.   *Id.* at 4.[18]   The deductions, totaling $57,610.03, included reductions to hourly rates charged and items of billing that Arrowpoint's coverage counsel deemed unnecessary.   Neither side has submitted exhibits containing sufficient detail to determine precisely which billing entries were reduced or eliminated in coverage counsel's review.   Presumably, however, the Insurers' coverage counsel would have eliminated billing for any items that they deemed unreasonable (including communications with local New Jersey counsel) and would have reduced all hourly rates to those that Arrowpoint deemed reasonable.

The bottom line is that the amount of pre-tender expenses deemed reasonable by defendants' own coverage counsel exceeds, by over $9,000, the $200,000 in fees that Baker's Express seeks to recover in this litigation.   In order to defeat Baker's Express's right to recover $200,000 out of the $267,242.57 in pre-tender litigation expenses, the Insurers would need to demonstrate that more than $67,242.57 of the pre-tender expenses were unreasonable.   But, the Insurers have not submitted any itemized evaluation of Miles & Stockbridge's billing from which a fact finder could arrive at that conclusion.

The Insurers baldly assert: "Had Arrowpoint been given the opportunity to be involved in the defense of the *Barnes* Action at this time [*i.e.*, pre-tender] they may have been able to more

---

[18]   The same report also indicates that Zurich's coverage counsel concluded that $228,582.38 of the pre-tender expenses was reasonable.

efficiently direct the work." Insurers' Motion at 22. But, on its face, this argument is pure conjecture. *See Porter Hayden II*, 116 Md. App. at 668, 698 A.2d at 1197 ("'Alleging only possible, theoretical, conjectural, or hypothetical prejudice is not enough.'") (citation and emphasis omitted). The Insurers have not proffered any expert testimony as to attorneys' fees or any detailed analysis of the Miles & Stockbridge billing. Nor have they offered any concrete and admissible evidence to demonstrate that they would have been able to command lower rates or spur more efficient litigation of the Barnes Lawsuit in the pre-tender period. Accordingly, they have not raised a triable issue of fact as to the issue of reasonableness and prejudice with respect to the pre-tender attorneys' fees. In the absence of such a showing, the Insurers cannot meet their burden of proof, and Baker's Express is entitled to recover the $200,000 in pre-tender expenses that it seeks.

### F.  Pre-Judgment Interest

Baker's Express contends it is entitled to pre-judgment interest at Maryland's "legal rate" of 6% per annum, dating from the issuance of Arrowpoint's reservation of rights letter in September 2007. The Insurers argue that Baker's Express has waived its entitlement to pre-judgment interest by failing to request it in the *ad damnum* clauses of its complaint or mentioning pre-judgment interest in its answers to interrogatories.

The Fourth Circuit has held that "state law applies to questions involving prejudgment interest in diversity cases." *United States v. Dollar Rent A Car Systems, Inc.*, 712 F.2d 938, 940 (4th Cir. 1983). In Maryland, if pre-judgment interest is recoverable, it accrues at the constitutionally established "legal rate" of 6% simple interest per annum, *see* MD. CONST., Art. III, § 57, unless otherwise specified in the parties' contract or a superseding statute. *See, e.g.*, *Md. Nat. Bank v. Cummins*, 322 Md. 570, 600, 588 A.2d 1205, 1219 (1991) ("Absent a

contractual stipulation or a statute, the rate of prejudgment interest may not exceed the general legal rate of six percent."); *Noyes Air Conditioning Contractors, Inc. v. Wilson Towers Ltd. P'ship*, 122 Md. App. 283, 293, 712 A.2d 126, 131 (1998).

In my view, there is no merit to the Insurers' argument as to waiver of the claim for pre-judgment interest.  Although Baker's Express did not request interest in the *ad damnum* clauses of its complaint, it alleged, in the paragraph immediately preceding the *ad damnum* of Count One, that it had "been damaged in the amount of $200,000, *plus interest thereon*."  Complaint ¶ 47 (emphasis added).  Moreover, in response to an interrogatory by the Insurers regarding Baker's Express's calculation of its damages, Baker's Express contended that the Insurers were liable for "$200,000 according to the contract of insurance between Plaintiff and the Defendants, *plus interest*."  Answer to Interrogatory #3, Ex.1 to Insurers' Surreply at 5 (ECF 40-1) (emphasis added).  Therefore, plaintiff's claim for interest, pre-judgment or otherwise, should have come as no surprise to the Insurers.[19]

Moreover, even if these statements were not sufficient to place the Insurers on notice of Baker's Express's claim for pre-judgment interest, the claim of waiver is still unavailing.  Rule 54(c) of the Federal Rules of Civil Procedure provides: "Every [non-default] final judgment should grant the relief to which each party is entitled, *even if the party has not demanded that relief in its pleadings*."  (Emphasis added.)  Federal courts applying Rule 54(c) have consistently held that a party's entitlement to pre-judgment interest is not waived even by failing to request interest as late as the pre-trial order or at trial.  *See, e.g.*, *RK Co. v. See*, 622 F.3d 846, 853 (7th Cir. 2010) ("'[A] failure to request prejudgment interest in the final pretrial order does not result

---

[19] Perhaps the Insurers construed plaintiff's references to "interest" as referring to post-judgment interest.  However, an explicit request for post-judgment interest would be completely unnecessary.  "[P]ost-judgment interest is awarded by statute as a matter of law so it is automatically added, whether or not the district court orders it," in every judgment.  *Dunn v. Hovic*, 13 F.3d 58, 62 (3d Cir.), *cert. denied*, 510 U.S. 1031 (1993).

in a waiver."); *Rathbone Land Co., L.L.C. v. Ascent Energy, Inc.*, 610 F.3d 249, 262 (5th Cir. 2010) (stating that a rule "that failure to specifically request pre-judgment damages in the pre-trial order bars a judge from awarding them in his final judgment" would "undermine" Rule 54(c)); *Meaux Surface Protection, Inc. v. Fogleman*, 607 F.3d 161, 172 (5th Cir. 2010) ("'[I]n diversity cases, it is not necessary for the plaintiff's pleadings to contain a prayer or other request for pre-judgment interest.'  If state substantive law provides for the recovery of interest, Federal Rule of Civil Procedure 54(c) requires that such be included where appropriate.") (Internal citation omitted); *Stanford Square, L.L.C. v. Nomura Asset Capital Corp.*, 232 F. Supp. 2d 289, 291 (S.D.N.Y. 2002) (holding that prevailing party "did not waive recovery of prejudgment interest in this case by failing to request prejudgment interest in its pleadings or at trial").

Although Baker's Express has not waived its pre-judgment interest claim, I nonetheless conclude that it is not entitled to an award of pre-judgment interest for the period preceding this Court's entry of an order disposing of the motions.  I shall explain.

In *Buxton v. Buxton*, 363 Md. 634, 770 A.2d 152 (2001), the Maryland Court of Appeals recognized that there are "three basic rules governing the allowance of pre-judgment interest" in Maryland.  *Id.* at 656, 770 A.2d at 165.  First, prejudgment interest is "allowable as a matter for right" in cases where "'the obligation to pay and the amount due had become certain, definite, and liquidated by a specific date prior to judgment.'"  *Id.* (citation omitted).  This category of cases in which prejudgment interest is awarded "as of course" includes cases involving "written contracts to pay money on a day certain, such as bills of exchange or promissory notes, in actions on bonds or under contracts providing for the payment of interest, in cases where the money claimed has actually been used by the other party, and in sums payable under leases as rent."  *Id.* (citing *I.W. Berman Props. v. Porter Bros., Inc.*, 276 Md. 1, 16-17, 344 A.2d 65, 75 (1975)).

Second, prejudgment interest is not allowed "in tort cases where the recovery is for bodily harm, emotional distress, or similar intangible elements of damage not easily susceptible of precise measurement." *Id.* Finally, "[b]etween these poles of allowance as of right and non-allowance is a broad category of contract cases in which the allowance of pre-judgment interest is within the discretion of the trier of fact." *Id.* at 657, 770 A.2d at 165.

This case did not involve a contract to pay a fixed sum of money on a day certain, or its equivalent, so as to come within the first *Buxton* category. Nor is this a tort case within the second *Buxton* category. Instead, this case fits squarely within the third *Buxton* category, in which the trial court is ordinarily vested with discretion as to whether to award pre-judgment interest.

Seeming to suggest that this case comes within the first *Buxton* category, in which pre-judgment interest is available as a matter of right, Baker's Express cites *Brethren Mutual Insurance Co. v. Filsinger*, 54 Md. App. 357, 365, 458 A.2d 880, 885 (1983), for the proposition that, "[r]egardless of an insurer's good faith denial of coverage, a plaintiff is entitled to recover interest from the date coverage was denied." However, this statement must be considered in context. The *Brethren* Court repeatedly emphasized "the broad judicial discretion permitted on the question of prejudgment interest," and reviewed the trial court's award of pre-judgment interest under a deferential abuse of discretion standard. *Id.* at 364-66, 458 A.2d at 884-85. In making the statement on which Baker's Express relies, the *Brethren* Court was simply responding to, and rejecting, the insurer's argument "that when an insurer raises a good faith defense it should not be penalized by having to pay interest," as a matter of law. *Id.* at 365, 458 A.2d at 885.

Ordinarily, in a case that falls within the third *Buxton* category, whether to award pre-judgment interest is in the discretion of the fact-finder.  However, there are circumstances in which an award of pre-judgment interest would be an abuse of discretion.  The *Buxton* Court stated that it is an abuse of discretion to award pre-judgment interest where the "precise damages" are "unpredictable and incapable of estimation prior to verdict," and reversed a trial court's award of pre-judgment interest for abuse of discretion.  *Id.* at 658, 770 A.2d at 166.  Similarly, in *Baltimore County v. AECOM Services, Inc.*, 200 Md. App. 380, 28 A.3d 11 (2011), the Maryland Court of Special Appeals affirmed the decision of the trial court not to submit a pre-judgment interest claim to the jury, where "the damages amount was not liquidated or reasonably ascertainable until the verdict."  *Id.* at 432, 28 A.3d at 42.  The *AECOM* Court reviewed several other cases in which the Maryland appellate courts had reversed for abuse of discretion an award of pre-judgment interest or affirmed a trial judge's refusal to submit pre-judgment interest claims to the jury in similar circumstances.  *See id.* at 422-29, 28 A.3d at 36-40 (discussing, *inter alia*, *Taylor v. Wahby*, 271 Md. 101, 314 A.2d 100 (1974); *Pulte Home Corp. v. Parex, Inc.*, 174 Md. App. 681, 923 A.2d 971 (2007), *aff'd*, 403 Md. 367, 942 A.2d 722 (2008); and *Wartzman v. Hightower Prods., Ltd.*, 53 Md. App. 656, 456 A.2d 82 (1983)).

In this case, there is no dispute of fact for a fact-finder to resolve.  On the basis of the undisputed facts, I conclude that an award of pre-judgment interest accruing before the date of this Memorandum Opinion would be inappropriate, and an abuse of discretion, because the Insurers' liability was not "reasonably ascertainable until the verdict."  *AECOM*, 200 Md. App. at 432, 28 A.3d at 42.  Indeed, the most striking aspect of this case is that whether plaintiff was entitled to recover its pre-tender litigation expenses in any amount depended almost entirely on where suit was filed.  If suit had been filed in New Jersey, then New Jersey's "most significant

relationship" test for choice of law almost certainly would have resulted in the application of the substantive law of New Jersey, under which plaintiff would not be entitled to any recovery for pre-tender attorneys' fees.  Plaintiff is entitled to recover because it was entitled to file suit in Maryland, and Maryland follows the doctrine of *lex loci contractus* and permits recovery of pre-tender litigation expenses in the absence of prejudice to the insurer.

Although New Jersey and Maryland adhere to different choice of law and substantive rules, it is not for this Court to say which state takes the best approach.  Each state has selected its rules on the basis of the best policy judgment of its courts and legislators as to what its citizens and litigants in its courts should expect.  What the Maryland Court of Appeals said in *American Motorists*, *supra*, 338 Md. at 578-79, 659 A.2d at 1303-04, is salient:

> It is axiomatic that Maryland law is Maryland law because our courts and legislature believe the rules of substantive law we apply are the best of the available alternatives.  From this fundamental principle, it is safe to assume our courts would prefer to follow Maryland law unless there is some good reason why Maryland law should yield to the law of a foreign jurisdiction. Our own substantive law is not only more familiar to and easier for Maryland judges to apply, but there has been a legislative or judicial determination that it is preferable to the available alternatives.  Sometimes . . . there are good reasons why our courts should, and do, apply the law of a foreign jurisdiction. . . .  [But,] [i]n declining to apply Maryland law to a contract made in another state, we do so not because we deem the law of the other state preferable to Maryland law, but because our preference for Maryland law is outweighed by considerations of simplicity, predictability and uniformity.

As I have already explained, I am obligated under governing legal principles to resolve this case according to Maryland substantive law.  Nevertheless, it is inescapable that defendants' liability was not capable of determination in advance of litigation, because defendants' liability depended on the forum in which suit was filed.  In my view, given this circumstance, Baker's Express is not entitled to an award of pre-judgment interest for the period prior to the issuance of this Memorandum Opinion.

The period following issuance of this Memorandum Opinion is a different matter.  As I will explain in the following section, judgment cannot be entered at this juncture because the issue of attorneys' fees for this litigation remains to be resolved.  But, as of the issuance of this Memorandum Opinion, the amount of the Insurers' liability has become liquidated and definite.  As discussed above, the Insurers have not asserted any serious challenge to the amount of their liability; their arguments have turned almost exclusively on whether they are liable at all.  Given that the Insurers have now been found liable, in my view, this case going forward effectively comes within the first *Buxton* category, as to which liability is definite and pre-judgment interest should be awarded as a matter of right.  Accordingly, defendants will be liable to plaintiff for pre-judgment interest at the Maryland "legal rate" of 6% simple interest per annum (which amounts to $32.88 per day on a principal sum of $200,000), accruing from the date that this Memorandum Opinion and its accompanying Order are docketed.

### G.  Attorneys' Fees for This Litigation

In a diversity action, a party's right to recover attorneys' fees is ordinarily governed by state law.  *See Ranger Const. Co. v. Prince William County Sch. Bd.*, 605 F.2d 1298, 1301 (4th Cir. 1979); *Rohn Prods. Int'l, LC v. Sofitel Capital Corp.*, Civ. No. WDQ-06-504, 2010 WL 3943747, at *4 n.13 (D. Md. Oct. 7, 2010) ("'In a diversity case, absent a conflicting applicable federal rule of procedure, state law governs not only the actual award of attorneys' fees but also the method of determining those fees.'") (citation omitted); *Glassman Const. Co. v. Md. City Plaza, Inc.*, 371 F. Supp. 1154, 1162 (D. Md. 1974).

In Count Two, Baker's Express seeks to recover attorneys' fees incurred in this action.  The Insurers dispute Baker's Express's entitlement to fee-shifting.  They observe that the general "American rule" in civil litigation is that each party bears its own costs of litigation.  *See*

Insurers' Motion at 23.  The defendants argue: "Absent a specific statute that overrides this rule and shifts costs to the 'losing' party, plaintiffs are responsible for the costs associated with bringing a lawsuit even if they were duly wronged and could seek redress in no other manner than the court system."  *Id.* at 23-24.  According to the Insurers, there is no exception to the American rule that applies in this case.[20]

Plaintiff did not respond to the Insurers' argument; in its briefing, it failed to address the issue of attorneys' fees for this litigation.  Despite plaintiff's silence on the issue, a non-movant's "failure to respond . . . does not fulfill the burdens imposed on moving parties by Rule 56." *Custer v. Pan American Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993).  "While the non-moving party runs a great risk by not responding, . . . the court still may only grant summary judgment if appropriate."  *Campbell v. Hewitt, Coleman & Assocs, Inc.*, 21 F.3d 52, 55 (4th Cir. 1994).

And, it is plain that the Insurers have overlooked a directly applicable exception to the American rule: ""There is one nonstatutory exception to the American rule in actions involving insurance policies. Where an action is brought to enforce an insurer's obligations under the third party liability provisions of a policy, and it is determined that there is coverage under the policy, the insurer is liable for the prevailing party's attorneys' fees.'"  *Megonnell*, *supra*, 368 Md. at 660, 796 A.2d at 774 (quoting *Bausch & Lomb*, *supra*, 355 Md. at 591, 735 A.2d at 1095); *see Mesmer v. MAIF*, 353 Md. 241, 264, 725 A.2d 1053, 1064 (1999) ("[D]amages for breach of the contractual duty to defend are limited to the insured's expenses, including attorney fees, in defending the underlying tort action, *as well as the insured's expenses and attorney fees in a separate contract or declaratory judgment action if such action is filed to establish that there*

---

[20] The Insurers acknowledge that recovery of attorneys' fees is permitted in Maryland in a statutory action for bad faith denial of insurance coverage under Ins. § 27-1001 and Md. Code (2006 Repl. Vol., 2012 Supp.), § 3-1701 of the Courts and Judicial Proceedings Article ("C.J."). However, the Insurers correctly observe that this case was not brought under those statutes.

*exists a duty to defend*.") (emphasis added); *see also Litz*, *supra*, 346 Md. at 232, 695 A.2d at 573; *Hess Constr. v. Bd. of Educ.*, 341 Md. 155, 159, 669 A.2d 1352, 1354 (1996); *Collier*, *supra*, 327 Md. at 11-13, 607 A.2d at 542-43.[21]  This common law fee shifting rule applies even if the insurer's position in declining to provide coverage was justified, albeit incorrect.  In *Nolt v. U.S. Fidelity & Guaranty Co.*, 329 Md. 52, 67-68, 617 A.2d 578, 585 (1993), the lower court had determined that the insured was not entitled to recover attorneys' fees, despite prevailing, because the issue of coverage was a "'very close question.'"  *Id.* at 67, 617 A.2d at 585 (quoting lower court).  The *Nolt* Court reversed, holding that the closeness of the coverage issue was "of no moment."  *Id.* at 68, 617 A.2d at 585.

The Insurers point out that they "did not disclaim liability for the underlying *Barnes Action*."  Insurers' Motion at 25.  As such, they reason that the "matter at hand is not an insurance question *per se*, but a contract dispute over whether Arrowpoint could possibly be responsible for fees incurred prior to its notice and acceptance of the defense."  *Id.* at 24.  This is not a meaningful distinction.  The Maryland Court of Appeals has made clear that the common law exception to the American rule for cases brought to enforce an insurer's obligations under a liability insurance policy applies to actions for recovery of litigation expenses from a liability insurer, even where the duty to defend is not in issue.  In *Continental*, *supra*, 302 Md. at 538, 489 A.2d at 547, the court rejected an insurer's claim that its "policy does not contain a duty to defend provision and . . . that the Maryland cases holding an insurer obligated to pay counsel

---

[21] This common law fee shifting exception is distinct from the statutory fee shifting in the context of bad faith denial of coverage actions discussed in the preceding footnote.  The distinction between the statutory and common law exceptions is that the common law exception "is limited to the enforcement of 'third-party liability coverage' and does not apply to actions against an insurer to enforce first party coverage."  *Bausch & Lomb*, 355 Md. at 591, 735 A.2d at 1095.  In contrast, the bad faith denial of coverage statute "applies only to first-party claims under property and casualty insurance policies," C.J. § 3-1701(b), and (unlike the common law exception for third-party coverage policies) is subject to a showing of the insurer's bad faith and a requirement of administrative exhaustion.  *See* C.J. § 3-1701(d)-(e); Ins. § 27-1001(c)-(g).

fees of the insured in the litigation between them involved policies with a duty to defend provision."  The *Continental* Court said, *id.*:

> [T]hat distinction is meaningless.  The cases between insurer and insured in which counsel fees of the insured were awarded as part of the relief to the insured were concerned primarily with which party, insurer or insured, would pay for the defense of the action brought against the insured by a third party.  It makes no difference whether the duty to pay for the defense arises out of a promise to defend . . . .

Accordingly, I must deny the Insurers' motion on the issue of their liability for attorneys' fees.  Nevertheless, because Baker's Express has not moved for judgment as to Count Two, or submitted any evidence from which its reasonable attorneys' fees in this action can be calculated, that aspect of Baker's Express's claim must be resolved through further proceedings.

Judgment cannot be entered until Count Two is resolved.  Under Rule 54(d)(2) and Rule 58(e) of the Federal Rules of Civil Procedure, judgment should be entered in advance of a determination as a prevailing party's entitlement to attorneys' fees "unless the substantive law requires those fees to be proved at trial as an element of damages."  Fed. R. Civ. P. 54(d)(2)(A).  This case is the type of case anticipated by Rule 54(d)(2)(A).

As a general proposition, it is well established in the Fourth Circuit and under Maryland law that, where a "claim for legal costs is a substantive claim in that it is based on a contract that provides for the recovery of fees as an element of damages to be proved at trial," final judgment cannot be entered until the fee claim is resolved.  *Carolina Power & Light Co. v. Dynergy Marketing & Trade*, 415 F.3d 354, 360 (4th Cir. 2005); *see also G-C P'ship v. Schaefer*, 358 Md. 485, 488, 749 A.2d 823, 825 (2000) ("counsel fees that were awardable pursuant to the contract form part of the claim for breach of contract"); *SunTrust Bank v. Goldman*, 201 Md. App. 390, 402, 29 A.3d 724, 731 (2011) ("'attorney's fees recoverable pursuant to a contract are part of the damages claim'") (quoting *AccuBid Excavation, Inc. v. Kennedy Contractors, Inc.*, 188 Md.

App. 214, 231, 981 A.2d 727, 737 (2009)); *Monarc Const., Inc. v. Aris Corp.*, 188 Md. App. 377, 399, 981 A.2d 822, 831 (2009) (same).  Indeed, Maryland courts hold that attorneys' fee claims in contractual fee-shifting cases cannot be resolved after entry of final judgment, because "the entry of final judgment on a contract case extinguishes any contract-based right to further attorneys' fees," and "any lingering claims for attorneys' fees have no legal ground upon which to stand after the underlying contract is merged into final judgment and ceases to exist as an independent cause of action." *SunTrust*, 201 Md. App. at 402-03, 29 A.3d at 731.

Plaintiff's entitlement to attorneys' fees in this case does not arise from an express contractual fee-shifting provision, however.  Rather, it stems from Maryland's common law exception to the American rule in cases involving a particular type of contract, *i.e.*, third-party liability insurance policies.  I am unaware of a Maryland appellate decision specifically considering, in the context of this common law fee-shifting rule for disputes concerning third-party insurance coverage, whether the matter of attorneys' fees must be resolved before entry of judgment.  However, the Maryland cases recognizing this common law exception to the ordinary American rule uniformly describe the entitlement to attorneys' fees under the fee shifting rule as part of the insured's damages.  *See, e.g.*, *Mesmer, supra*, 353 Md. at 264-65, 725 A.2d at 1064 (stating that the "damages for breach of the contractual duty to defend" are composed of "the insured's expenses, including attorney fees, in defending the underlying tort action, as well as the insured's expenses and attorney fees in a separate contract or declaratory judgment action if such action is filed to establish that there exists a duty to defend") (citing cases); *see also Allstate Ins. Co. v. Campbell*, 334 Md. 381, 393, 639 A.2d 652, 657 (1994) ("'[A]n insurer is liable for the damages, including attorneys' fees, incurred by an insured as a result of the insurer's breach of its contractual obligation to defend the insured against a claim potentially within the policy's

coverage, *and this is so whether the attorneys' fees are incurred in defending against the underlying damage claim or in a declaratory judgment action to determine coverage and a duty to defend.*'") (emphasis added) (citation omitted).  Accordingly, as I see it, "the substantive law requires" the attorneys' fees "to be proved . . . as an element of damages," under Rule 54(d)(2)(A).[22]

It follows that, although the primary issue of liability has been resolved, judgment cannot be entered in this case until a determination is made regarding attorneys' fees for this litigation.[23] In Maryland, "the determination of attorneys' fees, and costs, is for the judge," even where the issues otherwise are subject to trial by jury.  *Admiral Mortgage, Inc. v. Cooper*, 357 Md. 533, 553, 745 A.2d 1026, 1036 (2000); *accord Friolo v. Frankel*, 403 Md. 443, 457 n.12, 942 A.2d 1242, 1250 n.12 (2008).  Moreover, a court "need not necessarily hold an evidentiary hearing to determine an appropriate award."  *SunTrust*, 201 Md. App. at 402, 29 A.3d at 730.  Accordingly, I will direct plaintiff to submit a motion, together with a memorandum and supporting itemized documentation, as to its reasonable attorneys' fees,[24] to which defendants may respond.

---

[22] In this case, the notion that attorneys' fees are a substantive legal issue that must be addressed in the final judgment is further reinforced by the fact that attorneys' fees were requested as a separate count of plaintiff's complaint.

[23] Fed. R. Civ. P. 54(b) permits a court to "direct entry of a final judgment as to one or more, but fewer than all, claims" if the court "expressly determines that there is no just reason for delay."  However, neither side in this case has requested certification of a partial judgment under Rule 54(b), and no party has called the Court's attention to any circumstances suggesting that there is "no just reason" to follow the ordinary practice of waiting to enter judgment until all claims have been resolved.

[24] In Maryland, "[c]urrent law allows a court to grant only those attorneys' fees it finds reasonable."  *SunTrust*, 201 Md. App. at 401, 29 A.3d at 730.  Thus, "courts must routinely undertake an inquiry into the reasonableness of any proposed fee before settling on an award."  *Monmouth Meadows Homeowners Ass'n, Inc. v. Hamilton*, 416 Md. 325, 333, 7 A.3d 1, 5 (2010).  The "reasonableness of attorney's fees is a factual determination within the sound discretion of the court."  *Myers v. Kayhoe*, 391 Md. 188, 207, 892 A.2d 520, 532 (2006).

**Conclusion**

For the foregoing reasons, I will grant in part and deny in part the motions for summary judgment.  An Order implementing my rulings follows.


Date:   September 20, 2012            _____/s/_____
                                     Ellen Lipton Hollander
                                     United States District Judge